Darrin Lynn PICKENS, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–90–1180.

Court of Criminal Appeals of Oklahoma.

March 25, 1993.

 

Sid Conway, Deputy Chief Public Defender, Denny Johnson, Loretta Jackson, Asst. Public Defenders, Johnie O'Neal, Public Defender, Tulsa, for appellant.

David Moss, Dist. Atty., Dennis Fries, Asst. Dist. Atty., Tulsa, Susan Brimer Loving, Atty. Gen., A. Diane Blaylock, Asst. Atty. Gen., Oklahoma City, for appellee.

OPINION

LUMPKIN, Presiding Judge:

Appellant Darrin Lynn Pickens was tried by jury and convicted of Robbery with a Firearm, After Former Conviction of a Felony (21 O.S.1981, § 801) (Count I); Shooting with Intent to Kill, After Former Conviction of a Felony (21 O.S.1981, § 652) (Count II); Assault with Intent to Kill, After Former Conviction of a Felony (21 O.S.1981, § 652) (Count III); and Murder in the First Degree (21 O.S.Supp.1982, § 701.7) (Count IV); in Case No. CF–90–717, in the District Court of Tulsa County. The jury found the existence of three (3) aggravating circumstances and recommended punishment of death for the murder conviction and imprisonment for fifty (50) years on Count I; ninety-nine (99) years on Count II; and ninety-nine (99) years on Count III. The trial court sentenced accordingly. From this judgment and sentence Appellant has perfected this appeal.

On February 8, 1990, at approximately 10:30 p.m., Appellant robbed the Circle K convenience store located on Berryhill Road in Tulsa, Oklahoma. The store clerk, Tina Sue Wolfe, was shot four (4) times, including once at close range in the head. The gunshot to the head proved to be fatal and Ms. Wolfe was pronounced dead on February 19, 1990. Approximately thirty-two dollars ($32.00) in cash and three dollars ($3.00) in food stamps was taken from the store.

During the early morning hours of February 9, 1990, Appellant robbed the Circle K store at 61st and Union in Tulsa, Oklahoma. Appellant entered the store shortly after 5:00 a.m., purchased two pairs of brown cloth gloves and left the store. He returned a few minutes later, jumped over the counter and told store clerk Earl Butler that he wanted all the money in the register. Mr. Butler filled a plastic Circle K sack with the money, food stamps and postage stamps from the register. Appellant initially said "you haven't seen me" "You haven't seen anything". Changing his

mind, Appellant stated "I think you have seen, so I'll just have to kill you." Appellant then shot Butler three times, once each in the shoulder, face and arm. Although wounded, Butler reached for the phone and called the police.

The Appellant, who had by this time exited the store, returned to shoot Butler again. With the gun pointed at his face, Butler fell to the ground. Appellant attempted to shoot four (4) times, but the gun did not fire. Butler kicked at Appellant, threw a trash can at him and physically struggled with him. When Appellant headed towards the door, Butler grabbed him, put him in a headlock, and continued to scuffle. Butler picked up the gun dropped by Appellant and pointed it at Appellant's chin. Butler clicked the gun twice, before Appellant got the gun away from him, hit him twice in the face with it and left the store. Approximately thirteen dollars ($13.00) in cash, nine dollars ($9.00) in food stamps and sixty dollars ($60.00) in postage stamps was taken from the store.

Based upon Mr. Butler's description, officers from the Tulsa Police Department spotted Appellant on the Osage Expressway and gave chase. Ignoring the officers' emergency lights, Appellant fled at a high rate of speed. He lost control of the car twice, the second time sliding into a chain link fence. Appellant exited the car and attempted to run when he was subdued by the officers.

Officer Dale White arrived on the scene to find Appellant on the ground in a prone position. White assisted in handcuffing Appellant, took him to his police unit and read Appellant his *Miranda* rights. Appellant made no reply to the rights which had been read but asked what he was being charged with. White told him that at that time he was being charged with the armed robbery and shooting from the Circle K at 61st and Union. Appellant replied "this ain't shit". White, proceeding with the arrest paperwork, commented that the guy who had been shot was about to die. Appellant replied that he had not shot anyone.

Once at the police station, Appellant was again read his *Miranda* rights by Officer White. He acknowledged understanding the rights but when asked if he would sign the waiver form, Appellant refused, stating that he did not want to sign. Detective Dick Bishop and Deputy Gary Ross from the Tulsa County Sheriff's Office entered the room and explained that they wanted to talk with Appellant. After an exchange of verbal insults, Appellant indicated that he did not want to talk with the deputies. As the deputies subsequently left the interview room, Police Sergeant Wayne Allen entered the room and requested blood and hair samples from Appellant. Sergeant Allen also removed blood from the Appellant's body and clothing. Appellant again initiated conversation concerning the charges and, after answering this third inquiry into the charges against him, Officer White asked Appellant if there was not someone he wanted to talk to, as he was facing some serious offenses. Appellant indicated that he wanted to talk to Sergeant Allen.

After viewing the waiver form that Appellant had refused to sign, Allen took Appellant to his office and began to question him about the robbery at the 61st and Union Circle K store. Allen, out of uniform, advised Appellant that he was a police officer, that Appellant did not have to talk with him, and that he had the right to an attorney. Appellant stated that he would talk with Allen as long as he was not with the men from the County. Appellant then admitted that he had committed the robbery. He explained that he had personal problems with the store clerk and that he entered the store with the intention of killing the clerk. He said he was very mad and could not help himself.

Allen then began to discuss the robbery and murder which had occurred at the Circle K on Berryhill. Appellant initially denied ever being in the store. After being told that his car was seen on the night of the robbery at the store, that police had pieces of car parts left from where the car had hit the trash dumpster, and that a projectile recovered from the scene matched those found at 61st and Union, Appellant put his head in his hands and

said "Goddamit, I did do that shit. I did shoot that woman twice. It wasn't even a hundred dollars." Appellant stated he remembered walking into the store and seeing the store clerk put her hand to her mouth as she saw the gun in his hand. Appellant said that as he was holding the gun in his right hand, it went off. He did not remember where the clerk was struck the first time, but did remember that she was lying on the floor the last time he shot her.

At the conclusion of this interview, Sergeant Allen again read Appellant his *Miranda* rights and told him he wanted to get his statement on tape. Appellant refused to sign the rights waiver form and stated that he did not want to be tape recorded.

## I. GUILT–INNOCENCE ISSUES

■ Appellant asserts that the trial court erred in denying his motion to suppress the confession as it was taken in violation of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Appellant argues that the confession was made to Sergeant Allen after he had invoked his right to counsel to the Tulsa County deputies.

■ In *Edwards*, the Supreme Court held that an accused who has been advised of his *Miranda* rights and invokes his right to have counsel present during custodial interrogation is not subject to further interrogation by the authorities until counsel has been made available to the accused, unless the accused himself initiates further communication, exchange or conversations with the police. In *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 493, 83 L.Ed.2d 488, 493 (1984), the Court stated that this prophylactic rule embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel; and second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked. See also *Walker v. State*, 795 P.2d 1064, 1067 (Okl.Cr.1990).

The testimony taken at the pre-trial hearings on the motion to suppress and that presented at trial was conflicting as to whether Appellant invoked his right to counsel. During pre-trial hearings, Tulsa County Sheriff's Deputy Gary Ross testified that when he and Detective Bishop attempted to interview the Appellant, he read Appellant his *Miranda* rights, that Appellant stated he did not wish to talk with the deputies and that he wanted an attorney. Ross stated that all questioning ceased and he and Bishop left the room. Officer White testified that he was in the room when Ross and Bishop attempted to talk with Appellant and that he did not hear Appellant request an attorney. At trial, White again testified that he did not hear Appellant request an attorney. Deputy Ross was not examined on whether Appellant invoked his right to counsel and therefore gave no testimony on the issue.

At the conclusion of the pre-trial hearings on the motion to suppress, the judge overruled the motion, finding that Officer White was the first officer to talk with Appellant, that Appellant had knowingly waived his rights and not requested an attorney; that Appellant did request an attorney when interviewed by representatives from the Sheriff's office, and that Appellant's inquiry into the charges against him reinitiated communications with the authorities and effectively revoked his previous request.

After a thorough review of the record, we find that the trial court properly found that Appellant had invoked his right to counsel to Deputy Ross. It is evident from the record that Appellant's refusal to talk with the representatives from the Tulsa County Sheriff's office was directed personally to the deputies based upon the heated verbal exchange which had just taken place between the deputies and Appellant. We also find that the trial court properly ruled that Appellant thereafter initiated further discussions with Officer White. After the exit of the Sheriff's Deputies, and Sergeant Allen's cleaning of the blood from Appellant, Officer White told Appellant it was time to book him in. Ap-

pellant's inquiry into the charges against him, the third inquiry in three (3) hours, "re-initiated" further communications with the police in the sense in which that term was used in *Edwards*. As stated in *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–1046, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405, 412 (1983):

> Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have been interpreted by the officer as relating generally to the investigation.

So too, the Appellant's inquiry in the present case could reasonably have been interpreted by Officer White as a willingness to further discuss the investigation and waive the right to counsel he had previously invoked. That it was so understood by both White and later by Allen is evidenced by White's exhibition of the waiver form refused by Appellant and Allen's repeated reminders to Appellant that he was a police officer, although out of uniform, that he did not have to talk with him and that he had the right to an attorney.

■ As there was no violation of the *Edwards* rule in this case, the next inquiry is "whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Oregon v. Bradshaw*, 462 U.S. at 1046, 103 S.Ct. at 2835, 77 L.Ed.2d at 413, quoting *Edwards v. Arizona*. (citation omitted). The determination depends upon the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused. *North Carolina v. Butler*, 441 U.S. 369, 374, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979).

■ The record shows that at the time he waived his right to counsel before Ser-

geant Allen, Appellant had been read his *Miranda* rights three (3) times within three (3) hours, given an opportunity to read the waiver form and sign it; that he had graduated from high school; that the only officers he refused to talk to with were the representatives from the Sheriff's office; and that there was no indication that he was under the influence of a controlled substance. The entire episode took place within approximately six (6) hours and Appellant did not suffer the prejudice which occurred during the four day lapse in interviews condemned in *Walker v. State*, 795 P.2d 1064 (Okl.Cr.1990). The record clearly shows that Appellant knowingly and intelligently waived his right to counsel to Sergeant Allen, who took extreme caution to ensure Appellant understood his rights prior to beginning his inquiry. Further, comments made by Officer White to Appellant that he was facing serious charges, his inquiries into whether there was someone Appellant would like to talk to and whether he wanted to give his side did not constitute badgering nor the type of questioning which would render the confession involuntary.

Accordingly, we find that sufficient evidence was presented to show that the Appellant knowingly and intelligently waived his rights and understood the consequences. Therefore, we will not disturb the ruling of the trial court permitting the introduction of a confession. *Jeffries v. State*, 679 P.2d 846, 850 (Okl.Cr.1984).

■ Appellant contends in his next assignment of error that the trial court erred in admitting State's Exhibits Nos. 25, 26, 28–31, slides depicting the wounds suffered by Tina Sue Wolfe. During an in-camera hearing, each slide was described by the examining pathologist, Dr. Distefano, and reviewed by the court. Appellant objected to the admission of each slide. It is well settled that the admissibility of photographs is a matter within the trial court's discretion. Absent an abuse of that discretion, this Court will not reverse the trial court's ruling. *Nuckols v. State*, 690 P.2d 463, 470 (Okl.Cr.1984) *cert. denied*, 471

U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).

The slides in the present case depicted the four gunshot wounds suffered by Ms. Wolfe. With the exclusion of Exhibit No. 27, there was no duplication in any of the slides. Photographs or slides of the wounds suffered by a murder victim have been held admissible. *Moore v. State,* 736 P.2d 161, 164 (Okl.Cr.1987), *cert. denied,* 484 U.S. 873, 108 S.Ct. 212, 98 L.Ed.2d 163 (1987). The fact that the pictures are gruesome does not of itself cause the photographs to be inadmissible. As in the present case, the probative value of photographs of murder victims can be manifested numerous ways, including showing the nature, extent, and location of wounds, and corroborating the medical examiner's testimony concerning the cause of death. *Thompson v. State,* 724 P.2d 780, 782 (Okl. Cr.1986); *Robison v. State,* 677 P.2d 1080, 1087 (Okl.Cr.1984). Accordingly, we find that the probative value of the slides outweighed any prejudice to the Appellant and that it was not an abuse of discretion for the trial court to admit the slides into evidence.

■ Appellant further alleges that the trial court erred in admitting into evidence the 911 tape made of Mr. Butler's call for help during the robbery of the 61st and Union store. In the approximately forty-five (45) second tape, Mr. Butler is heard calling for help immediately after being shot the first time by Appellant. The phone lines remained open as the Appellant re-entered the store and continued his assault on Mr. Butler. While the screams emanating from Mr. Butler as Appellant re-entered the store are admittedly disturbing, this does not render the tape inadmissible. The probative value of the tape; specifically, its corroboration of Mr. Butler's testimony, and its illustration of what actually took place during the commission of the offense, far outweighed any prejudice to the Appellant. By his own conduct, Appellant created the situation and determined the manner in which the crime was committed. The fortuitous circumstance which allowed the sounds of the crime to be recorded as it was being committed is relevant evidence which was properly presented to the jury. See 12 O.S.1981, § 2401. Therefore, we find no error in the admission of this evidence and this assignment of error is denied.

■ Appellant also contends that it was error for the trial court to admit into evidence State's Exhibits No. 51, 52, and 53, ballistic reports prepared by firearm examiner Richard Raska. Title 12 O.S.1981, § 2803(8), specifically prohibits the admission into evidence of investigative reports by law enforcement personnel as hearsay evidence. The intent of this restriction is to preclude the use of investigative reports in lieu of live testimony. In the present case, it is not clear from the record whether the reports were actually admitted into evidence. Assuming arguendo that they were admitted, any error is harmless, as Raska testified and was subject to cross-examination. Further, the reports themselves, technical documentation of test results, were at best merely cumulative to his testimony. Accordingly, we find that Appellant was not prejudiced by the reports and this assignment of error is denied.

■ The State also introduced into evidence a ski mask and a pair of sunglasses discovered in Appellant's car at the time of his arrest. Although introduced during the first stage of trial, the evidence did not become relevant until the second stage of trial. Appellant argues that the admission of this evidence during the first stage was an improper introduction of evidence of other crimes and was prejudicial, as it implicitly informed the jury that the Appellant was a habitual robber. While we find the probative value of the evidence during the first stage of trial slight, we fail to see how Appellant was prejudiced. The claim that the ski mask and sunglasses, by themselves, are evidence of other crimes is an implication apparent only to defense counsel. *Mahorney v. State,* 664 P.2d 1042 (Okl.Cr.1983).

## II. ISSUES RELATING TO PUNISHMENT

During the second stage of trial, the State sought to prove the existence of

three (3) aggravating circumstances; 1) the defendant was previously convicted of felonies involving the use or threat of violence to the person; 2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and 3) there exists a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. In his eighth assignment of error, Appellant contends that the aggravators of "prior violent felony" and "continuing threat" relied upon the same evidence, thereby "skewing the weighing process" and denying him a reliable sentencing proceeding.

 Use of the same evidence in different manners to support two aggravating circumstances does not necessarily make the two into one aggravating circumstance. *Berget v. State*, 824 P.2d 364, 376 (Okl.Cr.1991). In *Green v. State*, 713 P.2d 1032 (Okl.Cr.1985), *cert. denied*, 479 U.S. 871, 107 S.Ct. 241, 93 L.Ed.2d 165 (1986), we adopted the reasoning of the Supreme Court of Florida in *Delap v. State*, 440 So.2d 1242 (Fla.1983), and found that aggravating circumstances are only duplicative when they cover the same aspect of the defendant's criminal history.

 Here the State relied on three prior felony convictions to support both of these aggravators. However, the convictions were not used to show the same aspect of Appellant or his crime. As we stated in *Smith v. State*, 819 P.2d 270, 278 (Okl.Cr. 1991):

> The circumstance of prior violent felony shows the aspect of a defendant as a violent and incorrigible person whose present act, viewed in conjunction with his past conduct, can be appropriately punished only by imposing the ultimate sanction. On the other hand, the continuing threat circumstance goes to the aspect of the need for protection of society from the defendant's probable future conduct. Although the jury must of necessity consider the defendant's past conduct in arriving at its prediction, this does not make his past and future aspects the same.

We must also note that evidence additional to the prior convictions was used to support the continuing threat circumstance. The State incorporated all of the first stage evidence into the second stage of trial and presented evidence of a first degree murder charge filed against Appellant in Creek County and his confession to that offense; together with Detective Hogan's testimony concerning Appellant's lack of remorse for the offenses on trial.

 In his next assignment of error, Appellant asserts that the videotaped confession to the Creek County murder was improperly admitted in violation of his Fifth and Sixth Amendment rights to counsel. Appellant compares this case to *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), wherein the Supreme Court held that once an accused requests counsel, interrogation must cease, and officers may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.

In the present case, Appellant invoked his right to counsel as to inquiry by the Tulsa County Sheriff's Deputies, then subsequently revoked that election on February 9, 1990, when speaking to Tulsa Police Officer White. The record shows that counsel was appointed and Appellant made his initial appearance before the District Court of Tulsa County on March 1, 1990. On March 9, 1990, Appellant was interviewed in the Creek County Sheriff's Office about a robbery and murder which occurred at a convenience store on February 4, 1990. Creek County Detective Larry Fugate testified that the interview occurred while Appellant awaited arraignment on the Creek County charges. He stated that he read Appellant his *Miranda* rights, Appellant indicated that he understood those rights, chose to waive them, signed a waiver to that effect, and then confessed to the Creek County offenses. No evidence was presented as to whether Appellant was represented by counsel in the Creek County charges.

The present case is distinguishable from *Minnick* in that Appellant had not expressed a desire to deal with the authorities only through counsel. Appellant had previously voluntarily, intelligently and knowingly waived his right to counsel by talking with Sergeant Allen. He then waived that right again by talking with Detective Fugate. No evidence has been presented to this Court to show that the trial court erred in admitting the Creek County statement as given voluntarily, intelligently, and knowingly.

Appellant further argues that the videotaped confession was admitted in violation of this Court's ruling in *Walker v. State*, 795 P.2d at 1065. We disagree and find that the facts of this case so distinguish it as to render *Walker* inapplicable. In *Walker* the defendant had been appointed counsel in Tulsa County on charges which originally included the Rogers County murder. Counsel had informed law enforcement officials that he was to be contacted prior to any questioning of the defendant or the removal of the defendant to another county. Prior to the interview with the Rogers County authorities, the defendant asked to see his attorney. Counsel could not be located and the defendant confessed to the Rogers County murder. The videotaped confession was then admitted in the first stage of the Rogers County trial as proof of the defendant's guilt.

In the present case, not only had Appellant waived his right to counsel, but the confession he gave was to a murder and robbery in Creek County and was admitted during the second stage of the Tulsa County trial as proof of the aggravating circumstances of "continuing threat" and "avoiding lawful arrest". Accordingly, we find no error in the admission of the Creek County statement and find that it was relevant evidence for the jury's consideration during the sentencing phase of trial.

 In his next assignment of error Appellant objects to Detective Hogan's testimony asserting that it was prejudicially cumulative. Hogan observed Appellant's confession to Sergeant Allen and took notes during the interview. Her testimony was cumulative to Allen's to the extent that she described certain aspects of the interview. However, the focus of her testimony was Appellant's demeanor and a conversation had with Appellant after he gave the confession wherein he expressed a lack of remorse for his actions and indicated that he had done nothing wrong.

We find Detective Hogan's testimony relevant and admissible as a part of the sentencing proceeding. Lack of remorse is an appropriate consideration for the jury in the second stage of a capital trial. Evidence of lack of remorse is pertinent to a finding that the defendant is a continuing threat to society. *See Fowler v. State*, 779 P.2d 580, 589 (Okl.Cr.1989). The probative value of this evidence outweighed any prejudice to the Appellant. Therefore, this assignment of error is denied.

 In his ninth assignment of error, Appellant alleges that the trial court failed to abide by the guidelines of *Brewer v. State*, 650 P.2d 54 (Okl.Cr.1982), for the procedures to be used in proving that the defendant was previously convicted of a felony involving the use or threat of violence to the person. In *Brewer*, this Court held that in all capital cases wherein the State has alleged the existence of the aggravating circumstance that the defendant was previously convicted of a felony involving the use or threat of violence to the person, the defendant must be given the opportunity to personally stipulate that the prior felony conviction alleged did involve the use or threat of violence to the person. Counsel for the defendant must not be allowed to so stipulate for him.

The procedure set forth in *Brewer* was not followed in this case. Appellant did not enter into the stipulation. His attorney entered the stipulation without objection from the Court or the prosecutor. Even though defense counsel in the present case, and not the defendant, offered the stipulation that the prior robbery convictions involved the threat of violence, the principles of *Brewer* were not violated. The purpose behind the procedure set forth in *Brewer* was to allow a defendant to enter into a stipulation to preclude the State from intro-

ducing evidence of the underlying facts of the prior convictions showing the use of or the threat of violence to the person. Here, the State did not put on any evidence of the underlying facts of the prior convictions, but merely offered certified copies of the judgments and sentences. Therefore, Appellant was not prejudiced by the admission of the underlying facts of the prior convictions without his personal approval. This assignment of error is denied.

 Appellant alleges in his tenth assignment of error that two of the three prior convictions used to prove the prior violent felony aggravator arose from the same event.[1] Citing to *Miller v. State*, 675 P.2d 453, 455 (Okl.Cr.1984), Appellant argues that it was improper for the jury to have been informed of the second transactional conviction. In *Miller*, this Court held that under 21 O.S.1981, § 51(B), convictions arising out of the same transaction, only one prior conviction can be used for enhancement purposes. *Miller* does not extend this principle to proof of aggravating circumstances in capital cases, nor does either party cite any authority for such an extension. To the contrary, we find that Section 51 is a Legislative enactment which applies only to the enhancement of punishment of second and subsequent offenses in regular felony cases.

 In the present case, at the direction of the trial court and based upon objection by the defense, the conviction for Possession of a Sawed-off Shotgun was removed from the second page of the information. However, documentation of the conviction was introduced into evidence, along with that of the two other prior convictions. In its instructions to the jury, the trial court neglected to direct the jury as to the use of the prior convictions.

Accordingly, we find that the prior conviction for Possession of a Sawed-off Shotgun could not have been used to enhance Appellant's sentences for the assault, robbery, and shooting with intent to kill, but

could have been used to prove the aggravating circumstance of prior violent felony; and that the trial court erred in failing to so instruct the jury. However, this error is not sufficient to cause a modification of any of the sentences imposed, as its impact was harmless in light of the two remaining valid convictions for violent felonies. *Miller v. State*, 629 P.2d 370, 371 (Okl.Cr. 1981).

 In his next assignment of error Appellant contends that the trial court erred in failing to respond to a note sent from the jury during deliberations asking, in effect, whether the sentences would run concurrently or consecutively. The trial court responded "sentencing is up to the court". The decision whether to run a defendant's sentences concurrently or consecutively rests within the sound discretion of the trial court. *Sherrick v. State*, 725 P.2d 1278, 1284 (Okl.Cr.1986). Therefore, the trial court's response was appropriate. Further, we disagree with Appellant's conclusion that the court's response, in conjunction with the denial of certain instructions requested by the defense, contributed to a constitutionally unreliable sentence. As discussed further in the opinion, the jury was thoroughly instructed as to the appropriate law and procedures to be followed in sentencing the Appellant. Accordingly, this assignment of error is denied.

 In his thirteenth assignment of error Appellant claims that three specific infirmities which occurred during the second stage of trial necessitate a vacation of his death sentence. First, he contends that the aggravating circumstance of "continuing threat" is unconstitutionally vague as applied and that the instructions given to the jury failed to adequately channel the sentencer's discretion. Appellant has properly preserved this issue for appellate review as he submitted two (2) proposed jury instruc-

---

1. State's Exhibits Nos. 55, 57, 58 and 60 showed that the prior convictions in Case Nos. CRF 84–1629, Robbery with a Firearm, and CRF 84–1630, Possession of a Sawed-off Shotgun, arose

out of Appellant's robbery of a convenience store by the use of a sawed-off shotgun, and that the sentences imposed for each conviction were to run concurrent.

tions to the court.[2] However, we have previously analyzed and upheld this aggravating circumstance, finding it specific, not vague, and readily understandable. *Boltz v. State*, 806 P.2d 1117, 1125 (Okl.Cr.1991); *Munson v. State*, 758 P.2d 324, 334 (Okl. Cr.1988); *Liles v. State*, 702 P.2d 1025, 1031 (Okl.Cr.1985); *VanWoundenberg v. State*, 720 P.2d 328 (Okl.Cr.1986). We are not now persuaded to alter that position.

■ Appellant further argues that instructing the jury in the permissive language that mitigating circumstances are those which "may be considered" as extenuating or reducing the degree of blame instead of using the mandatory language of "must be considered" allowed the jury to disregard mitigating evidence.[3] We disagree.

It is a well established rule that jury instructions must be read as a whole and not in isolation. *Redden v. State*, 739 P.2d 536, 538 (Okl.Cr.1987); *Luckey v. State*, 529 P.2d 994, 996 (Okl.Cr.1974). This applies to the second stage instructions of a bifurcated trial as well as the instructions in a non-bifurcated trial. In the present case, in addition to the above instruction, the jury was also instructed that the law sets forth "certain minimum mitigating circumstances you shall follow as guidelines in determining which sentence" to impose. The jury was further informed that "you shall consider any or all of the minimum mitigating circumstances which you find apply to the facts and circumstances of this case." The jury was told that they need not limit their consideration to the specifically listed mitigating factors and may consider additional mitigating evidence. Six-

teen (16) specific mitigating factors were then listed.

Reading the second stage instructions as a whole, it is clear that the jury was not told to disregard any mitigating evidence. In fact, it would have been an inaccurate statement of the law to instruct the jury that it "must" consider the mitigating evidence presented to reduce the blame as that would take away from the jury its duty to make an individualized determination of the appropriate punishment. Further, contrary to Appellant's argument, we find that the trial court properly excised three specific mitigating factors [4] from the list submitted to the jury as there was no evidence presented to support these alleged mitigators.

■ Finally, Appellant finds error in the failure to give an instruction that the jury had the option to return a life sentence regardless of its findings respecting aggravating and mitigating circumstances. In *Walker v. State*, 723 P.2d 273, 284 (Okl.Cr. 1986), *cert. denied* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986), the appellant claimed error in the refusal to give his requested instruction on "jury nullification". Defined as "the jury's exercise of its inherent 'power to bring in a verdict of [acquittal] in the teeth of both the law and facts' ", we found that most courts have uniformly held that a defendant is not entitled to such an instruction. *See also Williamson v. State*, 812 P.2d 384, 410 (Okl. Cr.1991). We find no error in the omission of this instruction in the instant case.

■ In his fourteenth assignment of error, Appellant contends that the trial court erred in rejecting his requested jury in-

---

**2.** Appellant's Proposed Instruction No. 27 directed the jury to look to Appellant's background, attempts to rehabilitate him, his show of remorse and "any other reasonable basis which may help you determine probability". Proposed Instruction No. 28 defined the term "society". (O.R. 193, 194)

**3.** Instruction No. 8 reads in its entirety: Mitigating circumstances are those which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame. The determination of what are mitigating circumstances is for you as jurors to resolve

under the facts and circumstances of this case. (O.R. 256)

**4.** The three mitigating factors requested by Appellant and excised by the trial court were: 17) [Appellant] has accepted responsibility for these crimes as demonstrated through his confessing; 18) The State has failed to disprove that [Appellant's] environment as a child and youth contributed to his actions in this case; 19) The State has failed to disprove that society at large will be adequately protected if [Appellant] is sentenced to life without parole. (O.R. 196)

struction that the decision regarding mitigating circumstances need not be unanimous. Appellant argues that this violated the dictates of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). This same argument was addressed and rejected in *Stiles v. State*, 829 P.2d 984, 997 (Okl.Cr.1992). We again reject the argument, referring to our decision in *Stiles* wherein we stated:

> In both *Mills* and *McKoy*, the Supreme Court held that a unanimity requirement concerning mitigating circumstances resulted in a constitutionally infirm death sentence. However, neither decision mandated that a trial court instruct a capital sentencing jury that unanimity is not required before each juror can consider a particular mitigating circumstance. Because the instructions and verdict forms in the present case did not require unanimity regarding mitigating circumstances, nor could they reasonably have been interpreted to require such, we hold that the jury was not precluded from considering any of the mitigating evidence proffered by appellant.

Appellant further contends the trial court erred in rejecting his requested jury instructions Nos. 14, 15, and 19. In Requested Instruction No. 14, Appellant asked that the jury be instructed concerning his mental state as mitigation.[5] The trial court properly rejected this instruction as there was no evidence presented to support the claim that the Appellant was un-

der extreme emotional or mental disturbance at the time of the offense. We further reject Appellant's argument that failure to give this requested instruction violated *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). In *Penry* the Supreme Court held that under the Texas "special issues" capital sentencing procedure, the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of the defendant's mental retardation and abused background prevented the jury from taking into consideration all of his mitigating evidence.

In contrast, not only do capital sentencing proceedings in Oklahoma differ from those in Texas, but the jury in the present case was not prevented in any way from taking into consideration all mitigating evidence presented. The jury was specifically instructed that it was to consider as mitigating circumstances several specific instances of emotional trauma in the Appellant's life, including the emotional trauma suffered by the deaths of his girlfriend and best friend; that he formed few emotional bonds during childhood, that he lived in a single parent home, in poverty with no stable source of income; and that he was in an educationally mentally handicapped classroom in school. When considered with the other instructions on mitigating circumstances, the jury was able to give full consideration to all evidence offered in mitigation.

---

**5.** Defense Requested Jury Instructions at issue read as follows:

Requested Instruction No. 14: You are instructed that the mitigating circumstance that the Defendant was under the influence of extreme mental or emotional disturbance is applied to a person who, while not insane, has more than the emotion of a average man. It applies to the person who, while legally answerable for his actions, may be deserving of some mitigation of sentence because of his mental state.

Requested Instruction No. 15: Mitigating circumstances are those circumstances which in fairness and mercy, should be considered by you in determining one's fate. They are circumstances about an individual's background, his family, the crime itself, the use of alcohol, drugs, or mental illness, or defendant's adapta-

bility to prison, or any other factor which you may wish to consider. You may consider anything which goes to the background of the individual, circumstances of the crime, and any other factor you might choose in mitigation or mercy.

Requested Instruction No. 19: You are instructed that when considering punishment that life imprisonment means imprisonment for life. You are instructed that the death penalty means that the Defendant will be put to death. You are also instructed that life without parole means that the Defendant will be in the penitentiary for all his life with no possibility of parole. You should draw no other conclusion concerning punishment than what is stated in this instruction.

Further, as to Requested Instruction No. 15, we find no error in its rejection as it was given, in the most part, to the jury in Instructions Nos. 8, 9 and 12. Similarly, we find no error in the rejection of Requested Instruction No. 19, defining the possible punishments available. It is sufficient to inform the jury, as in the present case, of the possible punishments which they could impose. Any further attempts at defining the meaning of life imprisonment or life without parole inappropriately focuses the jury's attention on the issue of parole, an issue which is not a proper consideration in their sentencing determination. *Miller v. State*, 751 P.2d 733, 740 (Okl.Cr.1988).

## III. PROSECUTORIAL MISCONDUCT

Appellant alleges that prosecutorial misconduct occurred at both stages of trial. Initially, Appellant asserts that over thirty (30) instances of allegedly reversible prosecutorial misconduct occurred during the first stage of trial. He argues that this misconduct took the form of impermissible comments on Appellant's right not to testify at trial; comments on the deterrent value of the death penalty; requests for sympathy for the victims; giving of personal opinions of Appellant's guilt; derogatory comments directed at defense counsel, her strategy and credibility; making objections which prevented defense counsel from explaining mitigation or determining if a potential juror would consider it; preventing defense counsel from exploring jurors' attitudes towards blacks and the higher percentage of blacks on death row; misstating the law; asking the jury to speculate as to facts not in evidence; stating that the prosecution was confident that the jury would reach the second stage and giving personal opinion on the appropriate punishment; and improperly injecting Appellant's character into the first stage of trial.

During the second stage of trial, Appellant argues that the following constituted prosecutorial misconduct: improper questioning of defense witnesses; improper comments on defense trial strategy; arguments exceeding the scope of the record;

appeals for victim sympathy; misstatements of evidence; minimization of the juror's role in assessing the death penalty; and requests to disregard evidence in mitigation. Most of these alleged misstatements, made in both stages of trial, were met with timely objections from the defense. Many of these objections were sustained, thus any error was cured. *See Shepard v. State*, 756 P.2d 597 (Okl.Cr. 1988).

Appellant has provided a very thorough brief in support of his argument and we appreciate his specific transcript page references and supporting case authority. We have meticulously reviewed every claim of prosecutorial misconduct raised by Appellant. However, we find it is not necessary to recite that review here and have therefore selected only certain allegations for discussion.

Initially, Appellant asserts that the prosecutor improperly commented during voir dire on the defendant's right to remain silent at trial. The record reflects that the prosecutor attempted to explain to the potential jurors the various rights possessed by a criminal defendant, including the right to remain silent and not present any evidence during the trial. The trial court overruled the Appellant's repeated objections.

"It is error for the prosecutor to comment—either directly or indirectly—at any stage of trial—upon the defendant's right to remain silent." *Hanf v. State*, 560 P.2d 207, 211 (Okl.Cr.1977). In *McGaha v. State*, 492 P.2d 1101 (Okl.Cr.1971), this Court held that in a situation where the accused failed to testify in his own behalf, the harmless error doctrine of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), would apply where there is no reasonable possibility that the comment complained of might have contributed to the conviction. *See also Stout v. State*, 693 P.2d 617, 623 (Okl.Cr.1984); *Young v. City of Tulsa*, 563 P.2d 156, 159 (Okl.Cr.1977); *Williams v. State*, 249 P. 433, 35 Okl.Cr. 171 (1926). While the comment in the present case comes dangerously close to causing a reversal of these con-

victions and a new trial, when compared to the exceptional amount of evidence against the Appellant, we find it did not contribute to the conviction and is therefore harmless error.

Appellant further alleges that during the first stage closing argument the prosecutor improperly appealed for sympathy for the victims. In the eight (8) pages of transcript cited by Appellant, the prosecutor attempted to describe the offenses from the viewpoint of the victims and referred to "the horror that went through Earl Edward Butler's mind when he's staring down the face of that gun", "that same horror that Earl Edward Butler went through, that you heard, Tina Sue Wolfe was going through at that time". The defense entered a contemporaneous objection to each of the statements complained of on appeal, and each objection was overruled.

 It is improper for the prosecution to ask jurors to have sympathy for victims. *Tobler v. State*, 688 P.2d 350, 354 (Okl.Cr.1984). However, the prosecution, as well as the defense, has the right to discuss fully from their standpoint the evidence, and the inferences and deductions arising therefrom. *Carol v. State*, 756 P.2d 614, 617 (Okl.Cr.1988). In *Peters v. State*, 727 P.2d 1386, 1388 (Okl.Cr.1986), a robbery with a dangerous weapon prosecution, we upheld references that the jury could consider what the victim may have been thinking as the gun was pointed at her. We stated that as fear was an element of the offense on trial, such references were proper. Further, references to the "unimaginable terror" of the victims were upheld in *Nguyen v. State*, 769 P.2d 167, 172 (Okl.Cr.1988) *cert. denied* 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989).

 Contrary to Appellant's arguments, these comments did not improperly ask the jury to speculate on the evidence. The description of the victims' reactions was based upon evidence presented at trial that Tina Sue Wolfe put her hand up to her face when she first saw Appellant with the gun, that she was shot at point blank range falling to the ground behind the counter but not dying instantly, and statements by Appellant to Mr. Butler that he would have to shoot him because he had seen him.

 Appellant also complains about the prosecutor's use of the term "execution" to describe the shooting of Ms. Wolfe. The evidence showed that Ms. Wolfe was shot once in the head, at close range. As the prosecutor's argument was reasonably based upon the evidence, we find no error. *See also Vaughn v. State*, 497 P.2d 769, 771 (Okl.Cr.1972) (upholding use of term "assassination").

 During his description of Mr. Butler's actions during the robbery, the prosecutor picked up the gun and pretended to fire it. Mr. Butler testified that the Appellant leaned over the counter, pointed the gun at him and attempted to fire twice, but the gun only clicked. As the record does not reflect any improper handling of the gun, and as the prosecutor's actions were based upon the evidence, we find the conduct was within the wide latitude of argumentation permitted during closing argument. See *Grant v. State*, 703 P.2d 943, 945 (Okl.Cr.1985).

 Appellant contends that the prosecutor stated his personal opinion and "inflamed the jurors by telling them that the spectators were present to see the jurors render justice by convicting the Defendant".[6] While we do not condone counsel's

---

**6.** Ladies and Gentlemen, you will be charged with the job of deciding whether or not the defendant, Darrin Lynn Pickens, is guilty of these crimes. It will be your job, ladies and gentlemen, to determine what is just and what is injust, what is right and what is wrong. Because today, ladies and gentlemen, you sit in the most powerful position that you'll ever have, that possibly anybody ever can. You will decide the fate of Darrin Lynn Pickens, the defendant. You will decide what is just or injust, what is right and what is wrong. Ladies and gentlemen, you look out here in the courtroom and you see all these people, and you ask yourselves, why are they here? What are they doing here? What are they doing in Judge Beasley's courtroom? Well, ladies and gentlemen, I submit to you they're not here to see me, they're not here to see defense counsel. They're not even here to see David Moss. But they're here to see you and see justice, ladies and gentlemen. Be-

references to the role of the spectators, we do not find this argument equivalent to those in other cases which we have held to be improper and prejudicial as playing on societal alarm or as inflaming the passions or prejudices of the jury. *See Jones v. State*, 610 P.2d 818, 820 (Okl.Cr.1980). The comments focused on the duty of the jurors to serve and render a verdict based upon the evidence. It did not convey the message that they must find the Appellant guilty based on emotional reaction. *Moore v. State*, 736 P.2d 161, 167 (Okl.Cr.1987).

■ Turning to the second stage of trial, Appellant contends that the prosecutor violated *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and sought to minimize the jurors' role in assessing the death penalty with such remarks as "you're not the executioners", "... but you don't have to live with the decision that you're going to execute him. You're not. You're not killing him. You're not executing him". These comments were made in response to closing argument by the defense and the characterization of the State's closing that "he wants you to execute him anyway."

The jury has the prime responsibility for deciding whether the death penalty should be imposed. We must be cautious to avoid any actions or directions which would tend to reduce the jurors' sense of responsibility for their decision. In *Caldwell* the Supreme Court stated that the constitution prohibits imposition of a death penalty which rests on a "determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* 472 U.S. at 320–30, 105 S.Ct. at 2633–40. When read in isolation, the prosecutor's remarks in the instant case would seem to violate *Caldwell.* However, when read in context of the entire closing argument, it is clear that the prosecutor was responding to the argument of defense counsel and did not in any way mislead the jury in an attempt to insulate them from their decision or diminished their responsibility in determining the ap-

propriate punishment. Further, in light of the explicit instructions given during second stage, nothing in the court's conduct can be said to have diverted the jury from its "awesome responsibility." *Caldwell*, 472 U.S. at 330, 105 S.Ct. at 2640.

■ The remainder of the comments complained of as error and not previously discussed, in both the first and second stages of trial, have been reviewed and we are unable to conclude that the remarks were so prejudicial as to adversely affect the fundamental fairness and impartiality of the proceedings. *Harris v. State*, 777 P.2d 1359, 1362 (Okl.Cr.1989). When determining whether a prosecutor's closing remarks were outside the record and so prejudicial as to warrant a reversal, the error is to be considered in light of the evidence and whether the remarks can be said to have influenced the verdict against the appellant. *Thornton v. State*, 668 P.2d 344, 346 (Okl.Cr.1983). Allegations of prosecutorial misconduct should not cause a reversal of judgment or modification of sentence unless their cumulative effect is such as to deprive the defendant of a fair trial and fair sentencing proceeding. *See Williams v. State*, 658 P.2d 499, 501 (Okl.Cr.1983). Such was not the case here.

While certain comments singled out by Appellant appear to exceed the bounds of fair argument when considered in isolation, when read in context of the entire closing argument, they become reasonable remarks, based upon the evidence, and did not deprive Appellant of a fair trial. The record reveals no showing of a bad faith attempt to prejudice the jury nor an intentional emphasis upon collateral matters. As we are not persuaded that the challenged remarks seriously affected the fairness of the trial, this assignment of error is denied.

However, we are compelled to advise the prosecutor that his comments came very close to causing a second trial. Reviewing his conduct and comments in their entirety and in comparison to the great weight of evidence presented against Appellant, we

cause today, ladies and gentlemen, you are jus- tice. (Tr. 636–637)

are able to find that his conduct does meet the standard of harmless error beyond a reasonable doubt. In doing so, we point out that it remains a mystery to this Court why prosecutors presenting cases involving overwhelming evidence of guilt, such as this one, persist in borderline argument which comes precariously close to snatching a reversal out of the jaws of victory. More consideration should be given in formulating a trial strategy that will ensure a conviction, once obtained at trial, will meet the requirements of appellate review. This type of trial preparation and strategy will more admirably fulfil the oath of office and serve the citizens of this State, especially the victims of criminal offenses.

## IV. MANDATORY SENTENCE REVIEW

Pursuant to 21 O.S.Supp.1987, § 701.-13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of an aggravating circumstance as enumerated in 21 O.S.1981, § 701.12. Having reviewed the record, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.Supp.1987, § 701.13(C). The jury found the existence of three (3) aggravating circumstances; 1) the defendant was previously convicted of felonies involving the use or threat of violence to the person; 2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and 3) there exists a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. We find that these aggravating circumstances were supported by sufficient evidence. 21 O.S.1981, § 701.12(4).

Accordingly, finding no error warranting reversal or modification, the judgments and sentences for First Degree Murder; Robbery with a Firearm, After Former Conviction of a Felony; Shooting with Intent to Kill, After Former Conviction of a Felony; and Assault with Intent to Kill, After Former Conviction of a Felony are AFFIRMED.

JOHNSON, V.P.J., and LANE, J., concur.

CHAPEL, J., specially concurs.

CHAPEL, Judge, specially concurring:

I specially concur in this case because I find that the police obtained appellant's confession in violation of his right to counsel, but, because of the overwhelming evidence of guilt, I find the error harmless.

To explain the constitutional violation at issue requires a brief review of the facts. When Officer Dale White arrested appellant, he read appellant his *Miranda* warnings, and asked if he wished to talk. Appellant did not respond, but later asked White what the charges against him were. White said he was charged with robbery. Appellant responded by saying, "This ain't shit." White told appellant his response was "pretty cold-blooded" and "the guy was about to die."

While White and appellant were sitting in White's patrol car, a number of officers came up to the car and asked, "is that the killer from Tulsa County?" At that point, appellant again asked White what the charges against him were. White told him he was to be charged with armed robbery, shooting, and alluding arrest.

White drove appellant to the police station and escorted him to the intake room. In the intake room, White read appellant his *Miranda* warnings. Appellant refused to sign the waiver of rights form. Officers Bishop and Officer Ross then entered the room, read appellant his *Miranda* warnings, and told him they wanted to talk. Ross stated that appellant said he "wanted to see an attorney, did not wish to talk with us." The interrogation stopped.

At some point shortly after this encounter, Officer Wayne Allen entered the room to recover blood from appellant. White stated that as Allen was finishing up with appellant, White:

> stood up, walked over to [appellant] and said, let's go get you booked in. He wanted to know what he was being

charged with again. I told him again what he was charged with, for at least the third time.

As we started to walk off I said, isn't there anybody you want to talk to? I said, you're facing some pretty heavy charges. And I said, don't you want to give your side of it? He said, yeah, I'd like to talk to that officer that was just here.

Officer Allen returned to talk with appellant. Allen asked White if he had read appellant his *Miranda* warnings, and White advised he had. Allen escorted appellant to his office where Allen advised appellant he did not have to talk with him and he had a right to an attorney. Appellant cut Allen off and said "I told you that I would talk to you as long as you're not with those guys from the county." Allen did not read appellant's *Miranda* warnings prior to questioning him. Appellant then made a number of incriminating statements to Allen, which were later used at appellant's trial.

Once a defendant invokes his right to counsel, questioning must cease until counsel is provided unless the accused himself initiates further communication with the police and voluntarily waives his rights. *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In *Edwards*, after the defendant invoked his right to counsel, an officer advised him that two detectives wished to speak to him. When the defendant refused to talk, he was told he "had to" talk to the detectives. The defendant met with the detectives and seemed willing to talk, but first the defendant requested to hear the taped statement of his co-defendant. After hearing that statement, the defendant confessed. The confession was introduced at trial.

In reversing the defendant's conviction, the *Edwards* Court noted that the invocation of the right to counsel is a significant event warranting special protection. *Id.*, 451 U.S. at 483–85, 101 S.Ct. at 1884–85. The Court held that the defendant "having

expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations." *Id.* 451 U.S. at 484–485, 101 S.Ct. at 1885.

The Supreme Court addressed what constitutes initiation of communication with police in *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). In *Bradshaw*, the defendant invoked his right to counsel. While the defendant was being transferred to county jail, he asked the officer " 'Well, what is going to happen to me now?' " The officer told the defendant that he did not have to talk to him and that since he had asked for an attorney any statements had to be a product of his free will. Defendant responded that he understood, and he and the officer spoke. During the course of that conversation, the officer advised the defendant that he should take a polygraph test. The defendant agreed, and the next day he submitted to the test. Before the test, the police read defendant his rights and he waived those rights. After the test, the officer told the defendant that he did not believe his story, and the defendant then confessed.

A plurality of the *Bradshaw* Court found the defendant's question to the police officer, " 'Well, what is going to happen to me now,' " constituted initiation of communication with the police. The plurality distinguished the defendant's question from routine questions such as a request for a drink of water or to use the telephone. Instead, the plurality found that the defendant's statement, although ambiguous, "evinced a willingness and a desire for a generalized discussion about the investigation." *Id.* 462 U.S. at 1045–1046, 103 S.Ct. at 2834–2835. The plurality then concluded that defendant knowingly and intelligently waived his rights when he confessed.

Four justices dissented from the plurality opinion in *Bradshaw*. The dissenters concluded that the question, " 'Well, what is going to happen to me now,' " was merely a normal reaction to the custodial sur-

roundings and the defendant's loss of freedom. Such a question did not evince a desire to discuss the subject matter of the investigation. One commentator has noted that the dissenters were "much closer to the mark" in analyzing Bradshaw's question to police. C.H. Whitebread & C. Slobogin, *Criminal Procedure, An Analysis of Cases and Concepts* at 411 (3d ed. 1992).

Here, appellant invoked his right to counsel.[1] After Allen had recovered blood from appellant and Officer White told appellant that he was going to book him, appellant asked Officer White for the third time what the charges against him were. Although Appellant's question to White—what was he being charged with—is quite similar to Bradshaw's question—what's going to happen me now—there are distinctions. First, appellant's question was in direct response to White's statement that he was going to take appellant and "get him booked in." Thus, appellant's question was not simply a spontaneous attempt to initiate conversation, but a response to a statement made by the officer about the next step that was going to be taken against appellant. Second, although appellant had twice before asked White what the charges against him were, White had indicated to appellant that one of the robbery victims was near death and other officers had referred to appellant as a "killer." Based on these comments, appellant could have legitimate questions as to the charges against him. And third, unlike *Bradshaw,* Officer White did not caution appellant about his right to counsel, but asked appellant if he wished to speak with someone.

Given the circumstances surrounding appellant's question, appellant did not initiate the conversation with the police officers. Appellant's question did not evince an intent to talk about the case. Rather, it was a perfectly understandable response to White's statement that he was going to book appellant, and appellant's response seems to be, at least in part, motivated by legitimate concerns raised by the comments of White and other officers implying that appellant was a "killer." Because appellant did not initiate communication with the police after he invoked his right to counsel, the confession should not have been admitted at his trial.

Although I find that this confession was obtained in violation of appellant's right to counsel, after a thorough review of the record and transcripts, I find this error was harmless beyond a reasonable doubt. Accordingly, I concur in the judgment of the Court.

---

1. Knowledge that a suspect has. invoked his right to counsel is imputed to all officers dealing with the suspect. *United States v. Scalf,* 708 F.2d 1540, 1544 (10th Cir.1983).