2004 OK CR 35

**Wayne Henry GARRISON, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2001–1513.**

Court of Criminal Appeals of Oklahoma.

Nov. 30, 2004.

An Appeal from the District Court of Tulsa County; the Honorable Jessie S. Harris, District Judge.

Art Fleak, Michael D. Morehead, Kurt Hoffman, Todd Cole, Jaime D. Pybas, Division Chief, Capital Direct Appeals Division, for appellant at trial.

Timothy Harris, Tulsa County District Attorney, District Attorney's Office, Steven L. Sewell, Chad Moody, Assistant District Attorneys, Tulsa, OK, W.A. Drew Edmondson, Attorney General of Oklahoma, Grant M. Elmore, Assistant Attorney General, Oklahoma City, OK, for the State on appeal.

LUMPKIN, J.

¶ 1 Appellant, Wayne Henry Garrison, was tried by jury in the District Court of Tulsa County, Case Number D–2001–1513, and convicted of First Degree Murder, in violation of 21 O.S.Supp.1989, § 701.7. The jury set punishment at death, after finding the existence of two aggravating circumstances: (1) Appellant was previously convicted of a felony involving the use or threat of violence to the person; and (2) the existence of a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society.[1] The trial judge sentenced Appellant in accordance with the jury's determination.

¶ 2 Appellant now appeals his conviction and sentence.[2]

¶ 3 Thirteen year-old Justin Wiles was reported missing from his Tulsa home on June

---

1. The State's Bill of Particulars originally alleged two additional aggravating circumstances: (1) the murder was especially heinous, atrocious, and cruel; and (2) the murder was committed for the purpose of avoiding or preventing lawful arrest or prosecution. However, the State struck both of these aggravators before commencement of the second stage of Appellant's trial.

2. Appellant's Petition in Error was filed in this Court on January 18, 2002. His brief was filed

June 24, 2003. The State's brief was filed October 23, 2003. Appellant's reply brief was filed November 12, 2003. The case was submitted to the Court October 23, 2003. We ordered an evidentiary hearing on March 17, 2004, to be held on or before April 30, 2004. The hearing was held on March 31, 2004, and findings of fact and conclusions of law were filed on May 13, 2004. Oral arguments were held on May 25, 2004.

20, 1989.[3] Four days later, his right hand and arm were discovered in the mud on the bank of Lake Bixhoma in Wagoner County, Oklahoma, inside a plastic bag. Law enforcement officials later found Justin's thigh inside a plastic bag, and his dismembered torso was discovered two tenths of a mile away behind some rocks. Justin's head, arms, legs, and genitalia had been dissected, post-mortem, from the torso with precise cuts through the soft tissue by a sharp instrument. His head was eventually found floating in the water with a rock tied to his jaw with a wire. Officials identified Justin's body through fingerprints and unique scars behind his ears.

¶ 4 Justin knew the defendant, who lived five houses down the street. Appellant owned a body shop that was located four blocks from Justin's home. Justin had performed odd jobs for the defendant at the body shop and had previously visited Appellant's home where they had watched a movie.

¶ 5 Justin was last seen alive with Appellant. According to Brian Hestdalen, Justin was at the body shop with Appellant and Scott Essary on June 20, 1989, around noon. At some point, Appellant, Hestdalen, and Essary left to run errands, leaving Justin locked inside the shop. Upon returning, Appellant mentioned fishing at Lake Bixhoma. Hestdalen heard Appellant ask Justin to join him. Hestdalen left the body shop around two to three o'clock p.m.

¶ 6 Scott Essary testified to seeing Justin and Appellant leaving the body shop in Appellant's car. This fact was somewhat corroborated by a fingerprint from Justin that was discovered on the inside passenger window of Appellant's car.

¶ 7 The evidence connecting Appellant to Justin's murder was largely circumstantial. During interviews, Appellant admitted seeing Justin on June 20, 1989, but claimed Justin left about 11:00 a.m., saying he would be back in an hour. Justin never returned. At noon, Appellant spoke with a neighbor. He went to see his insurance agent and then headed to Lake Skiatook to fish.

¶ 8 Appellant admitted to fishing at Lake Bixhoma, owning a six and a half inch combat knife, and being familiar with the area where Justin's body was found. During one interview at the police station, a police officer walked by and announced some body parts had been found in Lake Bixhoma. At this point, Appellant said, "I didn't do it" and left the station.

¶ 9 Inside Appellant's trunk, police found some red wire that had been cut and had a piece missing. A forensic specialist compared that wire with the wire affixed to the victim's head and testified they were of the same type.[4] Testing revealed that both wires had black strip caulk on them.

¶ 10 On June 27, 1989, police took a photo of a wound on Appellant's right forearm.[5] A State expert testified the wound was a "probable partial bite-mark". A defense witness, however, testified that the State's expert had insufficient data to make the determination he did, and that no definitive conclusion could be made regarding whether or not the injury was a bite-mark.

¶ 11 In order to get to the cove where Justin's head was found, officers had to take a curving dirt road that ran along the lake and had one or more picnic tables along it.

---

3. Justin's mother saw Justin asleep at home at about 5 a.m. when she got up for work. His sister left the house at about 11 a.m. for forty-five minutes. When she returned, Justin was gone. At 4:30 p.m., his family was conducting a full-blown search. They went to Appellant's body shop, "Choppers," where Justin had done odd jobs, but it appeared to be closed.

4. Experts originally compared the wires in July of 1989, but determined they did not match. The Tulsa World reported this story, after interviewing Bixby Police Chief Harry Ekiss. The story is, of course, hearsay. Nevertheless, the State has conceded this point.

5. Appellant had filed a claim for assault against his brother Paul Garrison on June 11, 1989, nine days before Justin went missing. A few days after Justin's body parts were found, officers interviewed Appellant about the assault claim and photographed a wound on his right forearm. Appellant claimed the wound was caused by an entrenching tool his brother had hit him with, although he originally said he'd been hit on the left arm. An officer had examined both of Appellant's arms before Justin went missing, but found no visible injury to either arm.

Approximately one month before Justin's murder, Appellant had taken his brother Paul Garrison fishing on the south side of Lake Bixhoma. Paul described a similar road Appellant had driven him down.

¶ 12 Another interesting piece of circumstantial evidence was Appellant's odd visit to his insurance agent, Jim Woods, sometime before 4:30 p.m. on June 20, 1989. Supposedly there to make an insurance payment, Appellant "socially forced" Woods to accompany him to the parking lot to view his car. Appellant had Woods examine the car and trunk. Woods thought this was unusual. He described Appellant as nervous, very animated, and speaking fast.

¶ 13 Richard Collins visited Appellant on June 21, 1989,[6] the day after Justin went missing. Appellant told Collins he was going to the salvage yard, but wouldn't allow Collins to accompany him. Collins testified Appellant was very dirty and had an offensive odor, like a gutted dead animal.[7] Later in the week, Collins claimed Appellant was acting nervous and strange, saying he wanted to account for every minute of the week. A week later, when Appellant and Collins went to a drive-in movie, Appellant said the police thought they had something—a pair of sweats with red primer they thought was blood.

¶ 14 A witness claimed to have seen Justin and a man eating at a restaurant near Lake Bixhoma at about 12:30 p.m. on June 20, 1989. Police had a composite sketch drawn of the man seen with Justin. The suspect was of a mixed race, possibly Hispanic and African American. Appellant is Caucasian. The witness testified the boy was hard of hearing and he was sure it was Justin Wiles. The witness testified Appellant was not the man accompanying Justin.

*Pre–Trial Issues*

¶ 15 In proposition one, Appellant claims the ten-year delay in prosecuting him for Justin Wiles's murder deprived Appellant of his rights secured by the Due Process Clause of the Fourteenth amendment to the United States Constitution and Article II, §§ 6 and 7 of Oklahoma's Constitution. Appellant points out he was charged with the murder of Justin Wiles on October 22, 1999, more than ten years after the crime occurred. Appellant claims no new evidence was developed from 1990 to the present. He claims "the only thing 'new' about the evidence this time around was that the State finally found 'experts' who could tell them what they wanted to hear."

¶ 16 The State, on the other hand, claims there was no due process violation and that the delay was investigative in nature and reasonable. The State also claims prosecutors have the right to delay filing murder charges until satisfied they can prosecute and establish guilt beyond a reasonable doubt.

¶ 17 Appellant filed a motion to dismiss due to the delay on April 12, 2000; arguments were heard on May 5, 2000. The defense argued the State had acted in bad faith and that the deaths of certain witnesses irreparably impaired Appellant's defense. The trial court found no bad-faith and denied the motion.

¶ 18 On January 12, 2001, Appellant filed an amended motion to dismiss due to the ten-year delay. The defense cited prejudice due to several missing records. However the motion was denied on March 28, 2001.

¶ 19 In *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the U.S. Supreme Court recognized the Due Process Clause of the Fifth Amendment could conceivably require dismissal of the criminal charges if it were shown that pre-indictment

6. Collins originally claimed this event occurred on June 19, the day before Justin disappeared. A year later, he claimed the event occurred on June 21, the day after Justin disappeared.

7. This testimony was somewhat corroborated by Christy Steenveld, who testified to stopping by Appellant's house in and around the same time period. Ms. Steenveld claimed Appellant was nervous and filthy with an offensive odor. However, during her first interview, just ten days after Justin was found to be missing, Ms. Steenveld claimed the event had occurred on June 19. Nine months later she changed the date to June 21.

delay caused substantial prejudice to the defendant and the delay was an intentional device to gain tactical advantage over the accused. 404 U.S. at 324, 92 S.Ct. at 465. Although it found no such violation had occurred in *Marion*, the Supreme Court stated it would look at each case according to its own circumstances. This Court will do the same.

¶ 20 In *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), the Supreme Court explained that a due process inquiry must consider the reasons for the delay as well as the prejudice to the accused. 431 U.S. at 790, 97 S.Ct. at 2049. However, a due process violation does not exist in the case of "investigative delay", even if a defense may have been somewhat prejudiced by the lapse of time. 431 U.S. at 796, 97 S.Ct. at 2052. An "investigative delay is fundamentally unlike delay undertaken by the Government solely to gain tactical advantage over the accused." 431 U.S. at 796, 97 S.Ct. at 2051, citing *Marion*. 404 U.S. at 324, 92 S.Ct. at 465. "Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." 431 U.S. at 791, 97 S.Ct. at 2049.

¶ 21 Here, in looking into the "reasons for the delay," the primary question is whether or not the prosecutorial delay was truly "investigative" in nature. A related question is whether or not there is any evidence of bad faith on the State's part. Appellant points out that all fact witnesses had been interviewed in 1989, the wire had been examined, and Appellant's "bite-mark" photo was in police possession. The evidence was considered "slightly less than enough" needed to prosecute for many years, until the Tulsa Police Department created a "Cold Case Unit" in 1998 to look at unsolved cases in a "new light."

¶ 22 In claiming the delay was reasonable and investigative in nature, the State points to the following evidence: there was some testimony that the murder investigation continued into 1990; in 1998 a detective looked through the photographs in the case file and determined the injury to Appellant's arm could be a bite-mark; an odontologist analyzed the photo and concluded the injury was a "probable partial bite-mark"; and the wire attached to Justin's head—which had been analyzed years earlier and found not to match—was reanalyzed in 1999 and found to be of the same type of wire with the same type of automotive strip caulk as that in Appellant's car. The State also points out there is no statute of limitations on murder.

¶ 23 It would be difficult to categorize any of this evidence as "new". Clearly, the authorities knew who the witnesses were in 1989 and had the physical evidence in their possession. However, this is not to say the police acted in bad faith, or even unreasonably, for there is no evidence the delay was for the purpose of gaining a tactical advantage. Nevertheless, much of the delay is attributable to the State's analysis and determination of the viability of the evidence in the case, for the State appears to have had the same ability to analyze the wire evidence and the photo in 1989. These were not new discoveries.

¶ 24 However, even if we rest the reasons for the delay entirely on the State's lap, there must be actual prejudice. On this point, Appellant alleges three "key witnesses" died between 1989 and his November, 2001 trial. His mother died in 1995 and supposedly could have testified to the "rapid departure" of Appellant's brother Paul from Tulsa after Justin disappeared.[8] In 1991, Appellant's grandmother Minnie Sperry died. She supposedly could have testified about Appellant's whereabouts and activities during the critical time frame. The same is alleged of attorney Barney Miller, who died in 1997.

¶ 25 Appellant argues, "these witnesses are dead and we have no way of ascertaining their testimony." He thus claims the ability to ascertain what they knew has been lost forever. To a certain extent, this is true.

¶ 26 The State, however, argues these are "bald assertions of prejudice" that are not supported by the record or affidavits as to

---

8. Appellant points out that his brother was a Vietnam vet who suffered from post-traumatic stress disorder and paranoia and had assaulted him just prior to Justin's murder.

what the deceased witness would have testified to." *See Williamson v. State,* 1991 OK CR 63, ¶ 25, 812 P.2d 384, 394 (citing *Johnson v. State,* 1988 OK CR 145, 761 P.2d 484 on this point). Of course, this reasoning is somewhat circular, for there is no ability to procure such affidavits when a witness is dead, unless those witnesses previously detailed what they knew to third parties. On the other hand, constitutional claims cannot be based purely on speculation.[9]

¶ 27 The record reflects Appellant was a suspect in this crime from the very beginning and was questioned within days of the murder. Indeed, he told one friend he needed to account for every minute. While the State has the burden of proof with respect to criminal prosecutions and a criminal defendant has the constitutionally protected right to remain silent, it is certainly not uncommon for those *suspected* of crimes to report circumstances amounting to a partial alibi or at least gather up fact witnesses and ask them to tell what they know. There is no evidence Appellant originally alerted police to interview any of these witnesses in the ten years before his arrest.

¶ 28 Regarding Appellant's mother, who lived in Arkansas, her testimony would have offered little, for the record reflects she had an antagonistic relationship with Appellant and her family for many years. Concerning her son Paul, he testified in this trial and was subject to cross-examination. This claim is simply too speculative to attach prejudice to it.

¶ 29 If Minnie Sperry had been able to testify, she might have mentioned that Appellant had her wash some bloody clothes and a bloody knife, thereby leading her to believe Appellant murdered Justin Wiles.[10] If true, Sperry's non-availability was possibly more prejudicial to the State than to Appellant. We have no hard evidence from anyone that Sperry knew of Appellant's whereabouts during the critical time frame. It also appears police interviewed her. Furthermore, Appellant's statements never mentioned spending any time with Barney Miller on the day Justin went missing.

¶ 30 Appellant's better claim is prejudice relating to witnesses who supposedly changed their testimony about important events to a material degree over time. For example, according to an August 31, 1989 police report, Brian Hestdalen originally told the police he did not hear Appellant say anything to Justin Wiles about going fishing on June 20, 1989. But at trial, Hestdalen claimed Appellant asked Justin if he wanted to go fishing at Lake Bixhoma on June 20, 1989, to which Justin said he would have to ask his mom. When confronted with this contradiction, Hestdalen at one point admitted what he originally said was probably correct, but later suggested his trial testimony was correct.

¶ 31 Scott Essary testified he saw Appellant, Hestdalen, and the victim at Appellant's shop on June 20, 1989. However, in June of 1989, Essary told police he tried to see Appellant at his house on June 20, but Appellant was in a hurry to see his insurance agent. Essary explained the discrepancy by referring to a court minute, which indicated he had been in Court to pay a ticket on June 19. He recalled that he went to Appellant's house from there, i.e., on June 19, and this was when Appellant was leaving.

¶ 32 Two witnesses, Rick Collins and Christy Steenveld, originally told police they had seen Appellant on June 19, 1989 between four and six in the afternoon. He was dirty with a foul odor. At trial, however, the witnesses claimed this event actually happened on June 20 or 21. Collins claimed Appellant had smelled like a gutted deer, thereby giving jurors the impression Appellant had just completed the process of cutting up his victim.

¶ 33 On cross-examination, Collins admitted this event likely occurred on June 19, as he originally reported. Steenveld, however, claimed her original report was a mistake Nine months after the events, she had re-

---

**9.** *Marion* specifically warned against "speculative" claims of prejudice. 404 U.S. at 326, 92 S.Ct at 466. This warning applies to the would-be witnesses, now deceased.

**10.** At the motion for new trial, the State indicated Sperry made this statement to Richard Collins.

freshed her memory by looking at a calendar and recalling she bought medicine for her son on June 19.[11] At trial, both witnesses acknowledged their fading memories.

¶ 34 We agree the passage of time had an impact on this trial. The trial judge essentially found so during sentencing. Some amount of prejudice is bound to occur when a trial is held twelve years after the crime, for memories fade. However, "no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution." *Marion,* 404 U.S. at 324, 92 S.Ct. at 465. The question is whether or not the amount of prejudice suffered rises to a constitutional magnitude, i.e., did it deprive Appellant of Due Process?

¶ 35 We think it significant that all of the points Appellant brings up were also pointed out to the jury during cross-examination. Collins recanted his testimony to a certain degree. Steenveld stated, "it's been a long time ago . . . ." Hestdalen wavered back and forth on his change of testimony, and Essary had an explanation for his change.

¶ 36 The point is the jury knew the evidentiary problems due to the passage of time and would have taken them into account during deliberations. We find Appellant's Due Process rights were not denied under the facts of this case.[12]

### First Stage Trial Issues

#### A.

■ ¶ 37 In proposition two, Appellant claims the State produced no evidence demonstrating the crime may have occurred in Tulsa County. Appellant claims this deficiency was a violation of the Fourteenth Amendment to the United States Constitution and Article II, § 20 of the Oklahoma Constitution.

¶ 38 This proposition is without merit.

¶ 39 Although the circumstances of Justin Wiles's murder are unknown, including exactly where the crime occurred, the State produced sufficient evidence that the crime may have been committed in Tulsa County. *See* Okla. Const. Art. II, § 20; *Patterson v. State,* 2002 OK CR 18, ¶ 27, 45 P.3d 925, 932. Justin disappeared from his Tulsa home. Appellant lived nearby. Justin was last seen at Appellant's Tulsa-based body shop. One witness saw Justin getting into Appellant's car in Tulsa County. Although the body was found in Wagoner County, dismemberment occurred after death, and there was some testimony Appellant had smelled unusually bad when persons saw him in Tulsa County. Appellant was acting nervous and strangely when he visited his Broken Arrow insurance agent on the day Justin went missing. Appellant's grandmother told a witness she had washed Appellant's knife at her home.[13]

#### B.

■ ¶ 40 In proposition three, Appellant claims the evidence was insufficient to convict him of first-degree murder beyond a reasonable doubt. Appellant further claims the evidence against him was entirely circumstantial and was thus required to exclude every reasonable hypothesis except that of guilt under our cases. *See, e.g., Hooks v. State,* 2001 OK CR 1, ¶ 8, 19 P.3d 294, 305 ("Circumstantial evidence must exclude every reasonable hypothesis other than guilt.") Appellant claims the evidence cannot pass that test. The State, however, claims the evidence excludes "all reasonable theories of innocence."

¶ 41 Based upon the lengthy delay in filing charges against Appellant, one could easily surmise the strength of the evidence would be an issue in this case. The evidence here

---

11. Indeed. Ms. Steenveld gave an affidavit to Appellant's counsel on appeal in support of an application for evidentiary hearing. Therein, Ms. Steenveld claimed her trial testimony was incorrect; that she had no reason now to doubt her original statement to police that Appellant came to her home on June 19, 1989. However, at the evidentiary hearing, Ms. Steenveld apparently switched positions again and testified consistently with her trial testimony.

12. As such, Appellant's primary grievance lies with the sufficiency of the evidence, addressed below.

13. This fact was not presented to the jury, as per a motion in limine. However, the trial judge was made aware of it, and we may rightfully consider it here on the issue of venue.

is entirely circumstantial and, at times, contradictory.

¶ 42 In the past, this Court has used a separate test for cases involving entirely circumstantial evidence, the so-called "reasonable hypothesis" test. Members of this Court have disagreed over the use of that test for many years.[14] However, in recent days, the Court has decided that the reasonable hypothesis test has lost its usefulness, is confusing, and no longer deserves to be followed. *See Easlick v. State*, 2004 OK CR 21, ¶ 15, 90 P.3d 556, 559 ("In the future, we will review sufficiency of evidence issues under the *Spuehler* standard, regardless of whether the evidence is wholly circumstantial or whether it is based in whole or in part on direct evidence.") That being so, *Spuehler* controls Appellant's sufficiency claims.

¶ 43 The evidence against Appellant primarily consists of the following. Appellant lived nearby Justin and had asked Justin to perform various odd jobs at his Tulsa body shop. Justin had visited Appellant at his Tulsa home on one occasion, and they had watched a movie. Appellant once took Justin with him to K–Mart. Thus, Appellant had an opportunity to commit the crime.

¶ 44 Phone records show Appellant was home at 11:06 a.m. on June 20. Police were able to confirm Appellant spoke with his neighbor at about noon.

¶ 45 Two witnesses, Brian Hestdalen and Scott Essary, testified they saw the victim at Appellant's body shop on the day he disappeared. Appellant admitted to police he had seen Justin Wiles that day.[15]

¶ 46 Hestdalen and Essary claimed they were with Appellant and Justin on the afternoon of June 20, 1989 at Appellant's body shop. The three men left to run some errands, leaving Justin behind at the body shop. They cashed a check[16], grabbed some food, and then returned to the shop to eat it. Essary saw Appellant leaving with the victim in Appellant's car sometime around 1:30 to 3 p.m. Based upon Hestdalen's testimony, the time would have been after 2 p.m., for he left between 2 and 3 p.m. and Essary was still there.

¶ 47 Hestdalen testified Appellant and Justin had discussed going fishing at Lake Bixhoma, but admitted, during cross-examination, he had originally said this had occurred earlier in the week. Hestdalen conceded his original statement was probably correct. Nevertheless, there is evidence in this record that Appellant was with the victim shortly before he disappeared.[17]

¶ 48 Sometime before 4:30 p.m. that same day, Appellant arrived at his insurance agent's office in Broken Arrow, acting nervously. He demanded to see his agent, and then socially forced the agent to accompany him to his car for no apparent insurance-related reason. Appellant then had his agent inspect his car, including the trunk. The agent found these requests unusual.

¶ 49 If jurors believed the testimony of Hestdalen and Essary, there was certainly time for Appellant to have killed Justin, hidden his body, and then driven over to the office of his insurance agent, where he was acting nervous.

¶ 50 Furthermore, two witnesses claimed they saw Appellant on June 21, 1989. He was extremely dirty with an offensive odor

---

14. I began challenging use of the reasonable hypothesis test in my specially concurring opinion in *White v. State*, 1995 OK CR 15, 900 P.2d 982, 993–995 finding the United States Supreme Court had long ago abandoned the idea that "circumstantial evidence was somehow more suspect or less reliable than direct evidence." I have consistently urged the Court to abandon the test and apply the test enunciated in *Spuehler* and *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

15. Appellant claimed Justin had left at 11 a.m., which contradicts testimony given by Brian Hestdalen and Scott Essary.

16. There was evidence admitted that Appellant cashed a check at his bank sometime between 2:40 p.m. and 2:49 p.m. If this was when Hestdalen and Essary were with Appellant, the time frames they have testified, shown below, are too early.

17. As discussed further below, according to Appellant, he last saw the victim at 11 a.m. According to a defense witness, the victim was later seen at a restaurant with a man other than Appellant. But according to Hestdalen and Essary, Justin Wiles was with Appellant as late as 3:00 p.m.

on his person. One witness associated the smell with a "gutted" animal. However, both witnesses had originally claimed the event happened on June 19, 1989, not June 21, 1989.

¶ 51 The victim's body had been dismembered post-mortem. Parts of it were discovered in Lake Bixhoma four days after Justin disappeared. Appellant was familiar with the lake and had fished there. Appellant had taken his brother Paul fishing on Lake Bixhoma, and they had traveled a winding road that curved around one or more picnic tables similar to the one by the cove where Justin's body was found. Appellant drew a map of the lake for police. The picture had an "X" drawn on it in the place where Justin's body was found.

¶ 52 Appellant's friend Richard Collins testified about Appellant acting "very nervous" during the week Justin disappeared. Appellant's wife and son were out of town. Appellant would not allow Collins to accompany him to a salvage yard, although he always had on previous occasions.

¶ 53 Later in the week, Appellant told Collins he had been trying to account for every minute of the week. When Collins asked why, Appellant associated his comment with the legal matter between he and his brother Paul, which had happened more than a week earlier. As Appellant and Collins were preparing to go to the drive-in, Appellant told Collins the police thought they had something, but they really didn't. Appellant said the police had a pair of his sweats that they thought had blood on them, when in fact the sweats only had red ox-blood primer on them. A day or two later, Collins saw Appellant at his grandmother's house, washing clothes. Collins thought this was strange. Furthermore, after Appellant moved he phoned Collins and told Collins he had better forget what he knew, because Collins had a daughter.

¶ 54 During a voluntary interview with police, when confronted by the fact that body parts had been found in Lake Bixhoma, Appellant blurted out, "I didn't do it." The trial judge instructed jurors to ignore part of the officer's answer, however, because the officer was about to mention Appellant exercising

his right to counsel. It is unclear whether the trial judge meant for jurors to disregard the "I didn't do it" statement. Be that as it may, Appellant's voluntary statement was admissible.

¶ 55 An expert testified the wire attached to the victim's head was the same type of wire taken from the trunk of Appellant's car. A section of the wire from Appellant's trunk was missing. The two wires also had what appeared to be strip caulk on them, which was a substance regularly used in the body shop business. It was possible, however, that strip caulk had been transferred from one wire to the other during the handling of the evidence (the wire attached to Justin's head had only a miniscule amount, while the other had much more). Furthermore, wire is fairly common, with only a few manufacturers nationwide.

¶ 56 Additionally, a photograph of Appellant's right forearm, taken on June 27, 1989, showed what one expert testified was a probable partial bite mark. There was nothing tying this evidence to the victim, however. Appellant claimed the arm injury was caused by his brother Paul, who had attacked him with an entrenching tool. However, on June 11, 1989, Appellant had called police to inform them of his brother's attack to his left arm. An officer examined Appellant's arm that day, but found no visible injuries.

¶ 57 A defense witness, Danny Beck, testified that he saw Justin Wiles at a restaurant near Lake Bixhoma at 11:40 to 1:10 p.m. on what he thought was June 20, 1989. Mr. Beck and his two associates saw a man yelling at a boy who was hard of hearing. Justin Wiles was hard of hearing. Mr. Beck said the boy looked right at him. The boy and the man then left together, heading south towards Lake Bixhoma.

¶ 58 Beck later saw a report on Channel 8 that Justin Wiles had been murdered. He recognized the boy right away and called the police. He was absolutely sure the person he saw was Justin Wiles. Mr. Beck testified the man with the boy did not look anything like Appellant, but did have similarities to Ray Farrar, Justin's stepfather. Mr. Beck had seen Ray Farrar in the hallway just before

testifying. He had been unable to pick Mr. Farrar out of a lineup, however, and there was other testimony that Mr. Farrar was at work that day. However, Mr. Beck was not exactly sure of the day. It occurred two to four days before he saw a report on the television about Justin. It is possible, therefore, that this event happened on June 19.

¶ 59 The evidence in this record is not as strong as one would like when dealing with the issue of capital murder. The record contains significant circumstantial evidence indicating Appellant murdered Justin Wiles and then attempted to cover his tracks. Appellant's odd behavior in the hours and days following the crime, including his statements about "a boy" and what appears to be deliberate attempts to establish an alibi, indicate he had guilty knowledge of what had transpired. Appellant's strange activities with his insurance agent near the significant time period is circumstantial evidence of guilt, as is his threat to Richard Collins and his voluntary statement, "I didn't do it," when confronted with the fact that body parts were found in the Lake. The bite-mark evidence, while certainly not decisive of the case, is relevant, considering Appellant's earlier visit by police, which led to the discovery of no wound.

¶ 60 Even though the first stage evidence is wholly circumstantial, the question of whether or not it excludes every reasonable hypothesis other than guilt is a determination to be made by the trier of fact. In this case, the jury found that it did, after being instructed, "all of the facts and circumstances, taken together, must be inconsistent with any *reasonable* theory or conclusion of a defendant's innocence" (emphasis added). We presume the jury followed this instruction in making its determination that Appellant was guilty beyond a reasonable doubt.

¶ 61 Twelve people reviewed the weight and credibility of the evidence and arrived at a unanimous decision that it was sufficient under the law. We find the evidence supports their decision. Most certainly, the evidence is sufficient to sustain the verdict when applying the test used by this Court in

*Spuehler v. State,* 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04. In other words, after viewing the evidence in the light most favorable to the State and accepting all reasonable inferences and credibility choices that tend to support the jury's verdict, any rational trier of fact could have found the essential elements of First Degree Murder beyond a reasonable doubt.

### C.

¶ 62 In proposition four, Appellant claims his trial was infected with improper, irrelevant, and purely speculative expert opinions, which, when considered as a whole, deprived him of a fair trial in violation of the Fourteenth Amendment to U.S. Constitution, Article II, § 7, of the Oklahoma Constitution, and 12 O.S.2001, §§ 2401–2403 and 2702.

¶ 63 Appellant claims the "dubious expert opinion testimony" about bite-marks and speaker wire did not assist the jury and was far more prejudicial than probative. He claims the evidence violated *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Taylor v. State,* 1995 OK CR 10, ¶ 15–17, 889 P.2d 319, 328–30. He also claims the evidence was not relevant under the Evidence Code and does not comply with an unpublished case from this Court.[18]

¶ 64 Concerning the bite-mark evidence, we find no error occurred. This Court has upheld bite-mark evidence by qualified expert witnesses, finding such evidence "can be a valuable aid to a jury in understanding and interpreting evidence in a criminal trial." *Kennedy v. State,* 1982 OK CR 11, ¶ 35, 640 P.2d 971, 978. Here, the expert, Dr. Brian Chrz, was a forensic odontologist and dentist with twenty-four years experience.[19]

¶ 65 The crux of Dr. Chrz's conclusion was that the patterned mark shown in photographs taken of Appellant on June 27, 1989, was a "probable bite-mark", which means, "the pattern strongly suggests or supports origin from teeth, but could-conceivably be caused by something else." Dr. Chrz did not

---

18. *Crider v. State,* F–1999–1422 (Oct.11, 2001).

19. Dr. Chrz was also the expert used in *Crider.*

render an opinion regarding whether or not Justin Wiles was the biter, because the trial court excluded such testimony in a bench hearing, after considering *Crider*.

¶ 66 Appellant's real complaint in this proposition is not to Dr. Chrz's credentials or the science used to reach his opinion. Rather, Appellant complains the testimony was not relevant, for there was no showing of a connection between the "probable bite-mark" and Justin Wiles. Without this link, Appellant claims the testimony was simply irrelevant and inadmissible.

¶ 67 While we agree that testimony concerning who was the biter would have been highly relevant and would have assisted the jury, such evidence was not available here. That being so, the trial court would not permit Dr. Chrz to testify Justin was only a "possible" biter or could not be excluded as the biter. That was wise, based upon the unpublished *Crider* opinion, which found such testimony violated *Daubert* and 12 O.S.2001, § 2403.[20]

¶ 68 Be that as it may, we disagree with the claim that the bite-mark evidence was not relevant or that its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, etc. The presence of a bite-mark on Appellant's right arm on June 27, 1989 was an important piece of circumstantial evidence. Appellant had claimed his brother Paul had caused the wound by striking him with an entrenching tool. However, he had originally reported Paul struck him on the left arm. On June 11, 1989, an officer examined both arms, but saw no observable injuries.

¶ 69 The sudden presence of a probable bite-mark on Appellant's right arm eight days later circumstantially suggested Appellant was concocting an alibi. Moreover, such evidence would add weight to malice aforethought, which the State was required to prove. While there are legitimate questions concerning how much weight to give such bite mark evidence, we find the question of its admissibility and relevance survive Appellant's constitutional and statutory attack, under the specific facts of this case.[21]

¶ 70 The speaker wire evidence is more problematic. As mentioned above, in 1989, police compared the wire taken from the speakers in Appellant's car to the wire affixed to the victim's head and concluded they did not match. Nevertheless, at trial, criminalist Jon Paulson testified for the State regarding the wires. The police had asked him to compare the two wire samples. Paulson admitted he was not optimistic in the beginning because wire "doesn't really yield itself to a lot of unique characteristics."

¶ 71 During the *Daubert* hearing held outside the jury's presence, Paulson admitted he originally believed the wires were not the same, since the one attached to the victim was a single strand black wire, while the speaker wire from Appellant's car was a dual strand red wire. Paulson explained, however, that the black wire was not a "natural discoloration" for red would normally turn to pink. He theorized the black wire may have been an overspray, but had no evidence to back up that opinion.[22] He further concluded the single strand wire had originally been part of a dual strand wire that had been separated, based upon his examination of a ridge on the single strand.[23] The wire in each strand consisted of twenty small strands of copper twisted together. The dual strand wire was coated with a black tarry substance, which was probably strip caulk, based upon Paulson's analysis. The single strand wire had one speck of this material on it, measuring the size of a period on a printed page.

---

**20.** *Crider* was a hotly-debated case, decided on a 3–2 vote. I dissented, finding the district court did not abuse its discretion in allowing experts to testify that they could not exclude, or say the marks were made by, the victim.

**21.** More follows concerning the issue of bite-marks, in our discussion of the remanded evidentiary hearing on ineffective assistance claims.

**22.** A photograph of the wire, State's exhibit A, seems to show a wire that is red in places and black in other places, somewhat confirming this theory.

**23.** Dual strand wire consists of two separate wires that are joined together by an insulated coating. The individual wires may be pulled apart to form two separate wires. This is essentially what Paulson concluded here.

¶ 72 Paulson concluded, outside the jury's presence, that the two wires could not be distinguished—that they are "the same type of wire." This was not all that surprising, for Paulson told the trial judge "there are probably three manufacturers of wiring, and they manufacture all the wire that's put out."

¶ 73 Defense counsel objected to Paulson's testimony, claiming it would not assist the jury in making their determination. Defense counsel argued Paulson's testimony was simply the two wires may or may not be the same, and, as to the source, Paulson could only say the wires "may or may not be" from the same source. Counsel pointed out that Paulson could not say the wire affixed to the victim came from Appellant's car with any certainty.

¶ 74 The trial judge overruled the objection and allowed Paulson to testify to his scientific analysis and comparison of the two wires. However, the trial judge sustained defense counsel's objection as to the source, ruling Paulson could not give an opinion on that issue.[24] Thus, Paulson was not allowed to testify the two wires may or may not be from the same source. Defense counsel argued this further confused matters, but his objection was overruled.

¶ 75 In the jurors' presence, Paulson spoke of the wires' similarities. He concluded the wires were indistinguishable except for the outside color. (One had some discoloration, which he never explained.) Other than that, the wires had the same type of plastic, same number of twisted strands, and were both "18 gauge." Paulson concluded they "are the same type of wire." Both had a smudged gray metallic or black substance, which he believed to be strip caulk, although one had much more than the other. Paulson theorized the single strand wire had once been part of a dual strand, by comparing its ridges.[25]

¶ 76 During cross-examination, Paulson admitted the strip caulk could have been cross-transferred from one wire to the other during his examination or by someone handling the evidence at a previous time. He admitted it was not surprising that the two wires had the same insulation or copper inside, for that would be common to almost all wire. He did not know how much of the wire is produced at any time, but acknowledged this was a common type of wire.

¶ 77 Jurors never heard testimony about the wire's source. Appellant claims this was error, i.e., Paulson's testimony should have either been excluded in its entirety or should have covered both the similarities and his conclusion that the wires may or may not have come from the same source. This argument has some merit.

¶ 78 We find no error in the trial court's ruling allowing Paulson to compare the wire taken from Appellant's car to the wire attached to the victim's head. Jurors were entitled to know that the wires were very similar. Moreover, Paulson's testing methods appear to have been reliable and relevant. *Taylor, 1995 OK CR 10,* ¶ 17, 889 P.2d at 329. Those methods did not violate *Daubert* for they assisted the jury in determining how the one strand wire could have come from the dual strand.

¶ 79 However, we find defense counsel should have been allowed to cross-examine Paulson and highlight his conclusion that the wires may or may not have come from the same source. In the absence of such information, jurors only heard part of the story. Having been told of the wires' similarities, there was some danger they would give the evidence more weight than it deserved. While one could argue this evidence was not relevant, as it concerned only "possibilities," we see this as an issue of cross-examination and adversarial testing. The State was allowed to present all the good, without all the bad.[26]

---

24. The trial judge apparently relied upon the *Crider* decision, but it is clearly distinguishable on this point.

25. At one point, Paulson testified the wires looked like speaker wire. Defense counsel objected to this as being beyond his expertise. The trial judge sustained the objection and admonished jurors to disregard the testimony that the wire appeared to be speaker wire.

26. We see a fundamental difference between the bite-mark evidence and the wire evidence, on the issue of source. Bite-mark evidence can draw definitive conclusions as to source, under the right circumstances, whereas wire evidence

¶ 80 Be that as it may, the error was somewhat invited, as defense counsel argued before the trial judge that the information as to source did not help the jury in making its determination. Furthermore, cross-examination brought out several important points regarding the wire, including that the wires tested were "common." Also, jurors were told the wires differed in color, without ever hearing any theory as to why. Defense counsel had the opportunity to provide its own expert on this issue, but did not. And last but not least, defense counsel argued extensively during closing arguments regarding the wire, stating the prosecution's evidence only showed the wires were of the same type and that to find the wire affixed to the victim was the same as that in the car was to "jump to a conclusion or to an assumption."

¶ 81 We find any error relating to the wire evidence was harmless under the facts of this case. *Simpson v. State*, 1994 OK CR 40, ¶ 36, 876 P.2d 690, 702.

### D.

¶ 82 In proposition five, Appellant claims other evidence and exhibits were improperly admitted in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and Article II, §§ 6 and 7 of Oklahoma's Constitution.

¶ 83 Appellant first complains about Rick Collins's "gutted deer" testimony. Collins testified at the pretrial about an encounter he had with Appellant during the crucial week, sometime between June 19 and June 24, 1989. Appellant came to his home, looking pretty dirty and having a bad odor on him. Collins likened the smell to that of a "gutted deer or castrated hog."

¶ 84 Defense counsel moved *in limine* to exclude this testimony, claiming it was far more prejudicial than probative and lacked relevance and foundation. The State gave its theory that Appellant was fresh from having dismembered the victim. The trial court

overruled the motion. Defense counsel re-urged his motion during Collins's testimony, but was again overruled.

¶ 85 During trial, Collins testified again about Appellant's "very bad odor" on the day in question, supposedly June 21, 1989. Appellant likened the odor to the smell of a gutted animal or castrated hog. Collins acknowledged that he himself had "gutted" a deer in the past, so he was familiar with the smell.

¶ 86 We find the trial judge did not abuse his discretion by allowing this evidence to be admitted. Although gruesome, such was to be expected with the instant crime. We find this evidence was somewhat relevant, for the State had to prove a link between Appellant and the victim's death. Appellant points out that Justin Wiles was not himself gutted. However, he was disarticulated. Moreover, one witness spoke of a smell of decomposing tissue on the body at the time it was found. Thus, Collins's description of the smell on Appellant's person cannot be considered unduly prejudicial under 12 O.S.2001, § 2403.[27] Any possible error in admitting this evidence was harmless. *Simpson, 1994 OK CR 40*, ¶ 36, 876 P.2d at 702.

¶ 87 Next, Appellant complains about Collins's testimony that Appellant called him sometime after Appellant left Oklahoma. Collins testified Appellant called Collins and said that Collins knew a lot about Appellant and that Collins had "better forget" what he knew because Collins had a daughter.

¶ 88 Defense counsel did not object to this testimony, waiving all but plain error. We find no plain error, because attempts to improperly influence or cause the absence of a material witness at trial is admissible to infer a consciousness of guilt. *Powell v. State*, 2000 OK CR 5, ¶ 66, 995 P.2d 510, 527, *cert. denied*, 531 U.S. 935, 121 S.Ct. 321, 148 L.Ed.2d 258 (2000).

would rarely be able to draw a conclusion on this issue, due to the fact that wire has few, if any, distinguishing characteristics.

27. Testimony regarding how one goes about gutting a deer should have been excluded, but Collins essentially volunteered this information after the trial judge had sustained an objection to it.

¶ 89 Finally, Appellant objects to the post-autopsy photograph of the victim's dismembered torso, with the medical examiner's "Y" incision down the middle was error. Appellant points out that he objected to this photograph before trial and during trial, but was overruled by the trial judge, after the State argued the "Y" incision was the least of anyone's concern and that the photograph was the only available photograph of the torso the State had. Furthermore, the State argued the evidence was necessary to prove the nature, extent, and location of the wounds.

¶ 90 In its brief, the State goes through much analysis to show a photo of the torso was relevant, more probative than prejudicial. We agree with some of this argument. However, this was not simply a photograph of the torso as it was found. It was a photograph of the torso after it has been cut through the middle during the autopsy and then crudely stitched up. The medical examiner testified the disarticulation and castration occurred post-mortem,[28] so it can hardly be said this evidence established anything with respect to the crime charged. At best, it was a circumstantial link to the foul odor on Appellant's person. In that respect, it is relevant. However, the State's claim that only one photo of the torso was available—the one showing the autopsy incisions—is a matter touching upon the failure of the State to timely preserve a photographic record of the evidence and the quality of the investigative work in that regard, the brunt of which should not be borne by a person who is innocent until proven guilty.

¶ 91 We find the post-autopsy photograph here, showing the "Y" incision and admitted without any sort of cropping, was substantially more prejudicial than it was probative under § 2403. See Fairchild v. State, 1999 OK CR 49, ¶ 68, 998 P.2d 611, 625–26 (distinguishing the case from others where "the post-autopsy photographs showed the irrelevant crudely stitched Y-incision on the exteri-

or of the body in addition to the relevant wound caused by the murderer"), cert. denied, 532 U.S. 1039, 121 S.Ct. 2002, 149 L.Ed.2d 1004 (2001). This is especially true considering the prosecutor's use of the photo during closing arguments in conjunction with "gutted deer" references.

¶ 92 We find, however, the erroneous admission of this photo, standing alone, did not render Appellant's trial unfair. Other photos equally startling were properly admitted at trial, and the jury was clearly informed the incision was the result of an autopsy. The photograph's admission in and of itself does not leave us with grave doubts concerning the trial's outcome. Simpson, 1994 OK CR 40, ¶ 37, 876 P.2d at 702. Combined with closing arguments, however the error is more problematic and will be addressed further as cumulative error.[29]

### E.

¶ 93 In proposition six, Appellant claims the trial court abused its discretion by failing to grant a mistrial after the State elicited testimony concerning his pre-arrest exercise of his constitutional right to remain silent and consult his attorney, in violation of the Fifth, Eighth and Fourteen Amendments to United States Constitution and Article II, §§ 7, 9, and 21 of Oklahoma's Constitution.

¶ 94 During Detective Makinson's testimony by the State in its case-in-chief, the prosecutor asked questions pertaining to a voluntary interview Appellant had with police at the police station on June 27, 1989. The prosecutor asked what emotional affect Appellant had during the interview. Makinson testified: "He initially said he knew Justin. We talked about him, his disappearance. He—after we started questioning further, he began to get nervous about what we were questioning him about." The prosecutor then asked: "Okay. What lead you to the conclusion that he was nervous?" Makinson

---

28. Thus, there is a good argument to be made that the photos were more relevant to second stage than in the first stage.

29. This Court has repeatedly held that autopsy photographs are not admissible. See Fairchild, supra. As a part of the exercise of professional responsibility, the prosecutor should not ever offer such photos into evidence. Furthermore, as a part of the gatekeeping obligation, the trial judge should not allow the admission of this type of photo into evidence.

responded: "The way he was—the way he was acting and—and the answers he was giving, and eventually he said that he needed to phone his lawyer."

¶ 95 Defense counsel objected at this point, claiming the testimony pertained to Appellant exercising his right to remain silent. The trial judge sustained the objection, but overruled counsel's motion for mistrial. The trial judge then issued a strong admonishment, *sua sponte,* telling jurors to "disregard every single thing this witness has said. It's not for your consideration at this time, nor should you consider it when you retire to decide your verdict in this case. In fact, you shouldn't even discuss any part of his testimony whatsoever." This admonishment wiped the slate clean, as jurors were told to disregard three and a half pages of testimony in its entirety.

¶ 96 Any comment on a defendant's exercise of his right to remain silent is error. *White v. State,* 1995 OK CR 15, ¶ 22, 900 P.2d 982, 992.[30] However, such an error may be "cured" where the trial court sustains the defendant's objection and admonishes the jury. *Id.* This is precisely what happened here. Thus the error in this comment has been cured, for we presume the jury followed the trial judge's directive.

¶ 97 This does not end the matter. Appellant points out the trial judge was concerned about such comments pertaining to the right to remain silent being made to the jury *before* Detective Makinson ever testified. On the previous day, the prosecution team called Detective Cook to testify and went through the same type of questions. The trial judge, obviously looking at a written report, called a bench hearing, in which it was made clear to steer the witness clear of any statement regarding Appellant's exercise of the right to remain silent.

¶ 98 Following Detective Cook's testimony, the State should have instructed Makinson, a police veteran, from making the comment he did. The record is unclear whether a forewarning was issued. However, the State's failure to prevent such testimony will be considered in our review of cumulative error.

**F.**

¶ 99 In proposition eight, Appellant claims the prosecutor argued Appellant's departure from Oklahoma to North Carolina was flight, which thereby suggested a consciousness of guilt. Thus, Appellant claims the trial court committed reversible error by failing to instruct the jury, *sua sponte,* on the proper use of such evidence. Appellant claims this was a violation of his right to due process and a fair trial under the Fourteenth Amendment to the United States Constitution and Article II, § 7 and 20 of the Oklahoma Constitution.

¶ 100 This is a variation of the issue presented in Appellant's seventh proposition. But here, Appellant claims that once the prosecutor raised the specter of flight, the trial judge had an absolute duty to instruct the jury regarding proper consideration of this evidence. *See* OUJI–CR (2d) 9–8.

¶ 101 The State argues the evidence "clearly established" Appellant was in flight and had a "consciousness of guilt". But that is an exaggeration. Appellant was interviewed by police before leaving town, and there is no suggestion he packed bags and fled in the middle of the night. The evidence could easily be construed as a defendant with a checkered past who knew he was a suspect and then departed to avoid media attention, angry neighbors, and, perhaps, continued police investigation.

¶ 102 Nevertheless, our cases and uniform instruction on flight have made it clear that an instruction on flight is warranted whenever evidence pertaining to conduct associated with flight is introduced, regardless of its low probative value on the question of consciousness of guilt, on the ground that whether the defendant's conduct actually constitutes flight in its legal sense is a question for the trier of fact. *See e.g., Farrar v. State,* 1973 OK CR 28, ¶ 16, 505 P.2d 1355, 1360 (such evidence which shows consciousness of guilt "should be held inadmissible only when the probative value of the evidence is diminished

---

**30.** Lumpkin, J., specially concurring.

by a lack of relevance to the charge"); *see also* OUJI CR 2d 9–8, Notes on Use.

¶ 103 The instruction probably should have been given,[31] but Appellant's counsel did not request it. We see valid strategic reasons for not requesting the instruction, however, for the instruction spells out how the evidence may be considered as circumstantial evidence of guilt. In light of the trial judge's admonishment to jurors to disregard the comments regarding "innocent people don't need to leave" during the trial and during jury deliberations, we find no plain error in the omission of this instruction, *sua sponte*. *See Hill v. State*, 1995 OK CR 28, ¶ 21, 898 P.2d 155, 163 (such statutory error can be waived by failing to object); *Paxton v. State*, 1993 OK CR 59, ¶ 14, 867 P.2d 1309, 1318, *cert. denied*, 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994).

### Sentencing Stage Issues

#### A.

¶ 104 In proposition ten, Appellant claims the victim impact evidence violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 9, and 19 of Oklahoma's Constitution. Appellant points to the victim impact statements from the victim's mother and sister, both of which had been put into writing, reviewed by the trial judge, and redacted in certain areas. Appellant argues the witnesses' opinions as to a recommended sentence violated his right to Due Process and to a fair trial and sentencing hearing, in violation of *Booth v. Maryland*, 482 U.S. 496, 508–09, 107 S.Ct. 2529, 2535–36, 96 L.Ed.2d 440 (1987). He also argues victim impact evidence violates the Eighth Amendment and acts as a "super-aggravator."

¶ 105 However, both of these arguments have already been addressed in numerous cases and rejected. *See, e.g., Lockett v. State*, 2002 OK CR 30, ¶¶ 28–30, 53 P.3d 418, 427, *cert. denied*, 538 U.S. 982, 123 S.Ct. 1794, 155 L.Ed.2d 673 (2003); *Murphy v. State*, 2002 OK CR 24, ¶¶ 40–47, 47 P.3d 876,

884–85, *cert. denied*, 538 U.S. 985, 123 S.Ct. 1795, 155 L.Ed.2d 678 (2003); *Turrentine v. State*, 1998 OK CR 33, ¶ 94, 965 P.2d 955, 980, *cert. denied*, 525 U.S. 1057, 119 S.Ct. 624, 142 L.Ed.2d 562. Moreover, the allowance for victim impact statements to include a recommendation regarding sentencing is statutorily based. *See* 22 O.S.2001, § 984(1), and Appellant raises no complaint regarding its constitutionality. This claim is without merit.

#### B.

¶ 106 In proposition eleven, Appellant claims the "continuing threat" aggravating circumstance is unconstitutional on its face and as applied in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 2 and 9 of Oklahoma's Constitution. Appellant claims the aggravator is unconstitutionally vague and impermissibly shifts the burden of proof to defendants.

¶ 107 This Court has repeatedly rejected this argument, and no new reason is presented here to convince us that our prior decisions were in error. *See, e.g., Williams v. State*, 2001 OK CR 9, ¶ 82, 22 P.3d 702, 722–23, *cert. denied*, 534 U.S. 1092, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002).

#### C.

¶ 108 In proposition twelve, Appellant claims the "prior violent felony" and "continuing threat" aggravating circumstances in this case relied upon the same evidence, thereby resulting in "double counting" in violation of the Eighth and Fourteenth Amendments to the United States Constitution. He cites to *United States v. McCullah*, 76 F.3d 1087 (10th Cir.1996), *cert. denied*, 520 U.S. 1213, 117 S.Ct. 1699, 137 L.Ed.2d 825 (1997) which found the use of duplicative aggravating factors creates an unconstitutional skewing of the weighing process, which necessitates a reweighing of the aggravating and mitigating factors.[32] The

---

**31.** Arguably, Appellant did not himself offer any evidence on this issue. The testimony came during direct examination of State's witnesses.

**32.** *McCullah* was primarily concerned about overlapping definitions of the aggravating circumstances themselves. However, looking at *McCullah* as a whole, including the opinion on

Tenth Circuit, in a subsequent decision, emphasized that factors do not impermissibly overlap unless one "necessarily subsumes" the other. *Cooks v. Ward,* 165 F.3d 1283, 1289 (1998), *cert. denied,* 528 U.S. 834, 120 S.Ct. 94, 145 L.Ed.2d 80 (1999).

¶ 109 The U.S. Supreme Court, however, has never ruled that aggravating factors could be duplicative so as to render them constitutionally invalid, nor has it passed on *McCullah's* "double counting" theory. *See Jones v. United States,* 527 U.S. 373, 398, 119 S.Ct. 2090, 2106–07, 144 L.Ed.2d 370 (1999). Thus, Appellant's constitutional claim stands, at the outset, on shaky grounds.

¶ 110 Be that as it may, assuming *arguendo* that a constitutional claim is available on this issue, we find the evidence supporting the two aggravating circumstances was not predicated on the same acts, nor did the evidence offered in support of one aggravating circumstance subsume the other.

¶ 111 Although there was some overlapping, the prior violent felony aggravator was supported by the Judgment and Sentence relating to Appellant's 1975 conviction for second-degree manslaughter in relation to three year old Craig Neal and Appellant's own stipulation that this was a crime of violence.

¶ 112 Furthermore, the continuing threat aggravator was supported by Appellant's admitted role in strangling his four year old cousin Dana Dean to death, when Appellant was thirteen.[33] Additionally, the Court allowed evidence relating to the similarity between the murders of Justin Wiles and Craig Neal, including that both were castrated, to support this aggravator.

¶ 113 Clearly, two separate crimes supported two separate aggravators, and Appellant's Eighth and Fourteenth Amendment rights were not violated.

### Issues Affecting Both Stages

#### A.

¶ 114 In proposition seven, Appellant claims the prosecution engaged in deliberate misconduct in both stages of trial, thus depriving him of a fair trial and reliable sentencing hearing. He lists seven instances from the record.

¶ 115 First, Appellant claims the prosecutor made improper first stage appeals to sympathy for the victim and his family. He points to instances in opening statements and first stage closing arguments when the prosecutors emphasized the victim was young and innocent, defenseless, a "little boy", and afraid of the dark. He also points to incidents in opening statements and first stage closing when the prosecutorial team spoke about effects of the crime on the victims.[34]

¶ 116 Appellant argues the State should not have distracted jurors from their responsibility to determine Appellant's guilt or innocence by focusing on these melodramatic pleas for sympathy, which had no relevance to any issue before the jury. The State claims Appellant received a fundamentally fair trial despite any sympathy that may have flowed from the prosecutor's arguments.

¶ 117 We have consistently held it is improper for the prosecution to ask jurors to have sympathy for victims. *Spears v. State,* 1995 OK CR 36, ¶ 59, 900 P.2d 431, 445, *cert. denied,* 516 U.S. 1031, 116 S.Ct. 678, 133 L.Ed.2d 527 (1995); *Pickens v. State,* 1993 OK CR 15, ¶ 57, 850 P.2d 328, 342, *cert. denied,* 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994). While victim

---

rehearing, it appears to fairly stand for the proposition that overlapping of two aggravating circumstances occurs when both aggravating circumstances are predicated on the same acts.

33. Appellant was never convicted for this crime, but was adjudicated a child in need of supervision.

34. Examples include: the prosecutors frequently pointed out the victim's mother and sister "never got to say goodbye"; the victim's mother never imagined her little boy would end up in pieces, slaughtered like an animal; the family was never able to see Justin's body because he had been butchered and discarded like trash; the victim's mother went through nights of searching and agonizing; the victim's mother couldn't see her child because he "didn't exist"; and the victim would still be alive if his sister had knocked on Appellant's door.

impact evidence may be appropriate in the sentencing phase of trial, it is error to introduce victim impact evidence in the guilt/innocence phase of trial. *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720, 736 (1991); *Spears,* 1995 OK CR 36, ¶ 59, 900 P.2d at 445. While the prosecution and the defense have the right to discuss fully from their standpoint the evidence, and the inferences and deductions arising there from, the guilt/innocence phase of trial is no place for subtle appeals for victim sympathy. *Id.; Pickens,* 1993 OK CR 15, ¶ 57, 850 P.2d at 342.

¶ 118 However, many of these incidents were not objected to, thereby waiving all but plain error. *Black v. State,* 2001 OK CR 5, ¶ 96, 21 P.3d 1047, 1078, *cert. denied,* 534 U.S. 1004, 122 S.Ct. 483, 151 L.Ed.2d 396 (2001). When defense counsel did object, the trial judge often sustained the objections and gave an admonishment. In such instances, the errors were "cured." *Id.* Other objections were properly overruled, although at times the prosecutor was still given direction about the appropriateness of his statement and arguments.

¶ 119 Having closely reviewed all incidents to which Appellant now objects, we find the pleas for sympathy did not individually or cumulatively deny him a fair trial. It is fair to say the prosecutors crossed over the line at times and injected improper sympathy into their arguments and opening statement. But defense counsel did a good job of lodging objections along the way, many of which resulted in sustained objections and admonishments. Some of the prosecutor's comments were within the latitude allowed during closing arguments. The jury was instructed not to allow sympathy, sentiment or prejudice enter into their deliberations. We presume they followed that instruction. Any error concerning this issue was harmless. *Simpson,* 1994 OK CR 40, ¶ 36, 876 P.2d at 702.

¶ 120 Second, Appellant claims the prosecutor repeatedly vilified him as the "dark-ness" in the lives of the victim and his family. We find no error.

¶ 121 Third, Appellant claims the prosecutor argued facts not in evidence. He points to several instances, one of which was cured when the trial judge sustained the objection and issued an admonishment. We find no plain error occurred with respect to the incidents that were not objected to. We further find no error with respect to the trial judge's rulings relating to the map Appellant drew. This sub-proposition does not require relief.

¶ 122 Fourth, Appellant claims the prosecutor commented on his failure to produce evidence and thus shifted the burden of proof to the defense. The trial judge issued a strong admonishment regarding the first instance,[35] and we find any error was cured. *See Patton v. State,* 1998 OK CR 66, ¶ 126, 973 P.2d 270, 302 (finding an admonishment to disregard an improper statement cured error), *cert. denied* 528 U.S. 939, 120 S.Ct. 347, 145 L.Ed.2d 271 (1999). Concerning the second instance, we find no error occurred.

¶ 123 Fifth, Appellant claims the prosecutor improperly argued Appellant's departure from the State was flight. Two witnesses were asked during the State's case in chief about Appellant's departure from the State following the murder. One witness testified that Appellant didn't think it was safe because of media coverage and neighborhood threats.

¶ 124 During closing arguments, the prosecutor argued, "Why would this defendant need to leave the State of Oklahoma...." Defense counsel objected as to form. During a bench conference, defense counsel argued the prosecutor was attempting to inflame jurors by insinuating Appellant was running from something. The prosecutor argued the evidence was relevant, and the objection was overruled. We find this ruling was not an abuse of discretion.

¶ 125 The prosecutor then argued, "innocent people don't need to leave the state." Another objection followed, which the trial

---

**35.** The prosecutor made a misleading comment on Appellant's failure to subpoena a witness. It is not necessarily error to comment on the failure to call witnesses or on the defense and State having the same subpoena power. But such comments may not mislead or draw questionable references from outside the record. *White v. State,* 1986 OK CR 153, 726 P.2d 905, 907.

court sustained. Thereafter, the trial judge, without prior request, admonished the jury to disregard the comment, saying, "It's not for your consideration at this time or when you retire to decide your verdict in the case." We find any misconduct here, again, was cured.

¶ 126 Sixth, Appellant claims the prosecutor made improper cries for justice during second stage closing. No objection was made to the first two comments, and we find no plain error occurred. The trial judge sustained an objection to the prosecutor's plea for jurors to give the ultimate value to the victim's life by their verdict, and instructed jurors to disregard it. This again cured the error.

¶ 127 Seventh, we find the trial judge also cured any error relating to Appellant's so-called lack of remorse. And finally, we find no error occurred with respect to the prosecutor's argument during second stage closing that if this case did not justify the death penalty, "what does?" This was a fair question and fell with the realm of reasonable argument.

¶ 128 Allegations of prosecutorial misconduct do not warrant reversal of a conviction unless the cumulative effect was such to deprive the defendant of a fair trial. *Powell*, 2000 OK CR 5, ¶ 151, 995 P.2d at 539. No criminal trial is perfect. *Id.* at ¶ 152. Here, the prosecutorial team was aggressive and consistently pushing the limits of acceptable argument. Defense counsel did not stand idly by, however, and lodged frequent objections. Such is the nature of our adversarial system. The trial judge was vigilant in admonishing jurors throughout the proceedings when improper comments and arguments were made. We thus find the cumulative effect of the instances of prosecutorial misconduct did not deprive Appellant of a fundamentally fair trial. Regardless, we continue to find it unsettling that prosecutors would push the boundaries of professional-

ism. First, as we have said previously, it defies common sense to use argument that can snatch defeat from the jaws of victory. *Kutin v. State*, 1967 OK CR 134, ¶ 4, 430 P.2d 848, 849. And second, arguments previously ruled improper by this Court can be grounds for disciplinary complaints to the Oklahoma Bar Association.

### B.

¶ 129 In proposition nine, Appellant claims he received ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution and Article II, § 20 of Oklahoma's Constitution. He first claims trial counsel was ineffective for failing to object to Rick Collins's graphic description of "gutting a deer." Counsel did object, however, and even moved *in limine* to exclude such references. Counsel provided effective assistance regarding this issue. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

¶ 130 Appellant further claims his trial counsel was ineffective for failing to rebut the "evidence" of flight or request a flight instruction. We have already addressed the strategic reasons for not requesting this instruction. Furthermore, counsel effectively cross-examined witnesses and argued Appellant's actions did not amount to flight. Again, we find no constitutionally ineffective assistance.

¶ 131 The majority of Appellant's claim, however, pertains to matters outside the record. Appellant's claims against his trial counsel fall generally into four areas: (1) counsel failed to call an expert witness to testify at the *Daubert* hearing regarding the "probable partial bite-mark"; (2) counsel failed to investigate the proposed testimony of State's witness Christy Steenveld; (3) counsel failed to investigate and discover a proper witness to verify Appellant's cancelled checks; and (4) counsel failed to investigate an adequate case for mitigation.[36]

---

36. Appellant's brief raises these four claims generally in his brief-in-chief, on one half page. His application for evidentiary hearing, however, goes into the specifics in great detail—102 pages of detail to be precise, not including the hun-

dreds of pages attached to the application as exhibits—and includes citations to and analysis of the matters *within* the record. This is a violation of Rule 3.11's provisions relating to applications for evidentiary hearing, the appellate brief

¶ 132 In support of these claims, Appellant filed a lengthy application for evidentiary hearing, pursuant to Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2003). We granted an evidentiary hearing, finding the application and supporting affidavits sufficiently rebutted the strong presumption of regularity of trial proceedings and trial counsel competency and contained sufficient information to show the Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective. We were most concerned about issue four, counsel's failure to investigate and then make an adequate case for mitigation. We listed nine questions to be addressed at the hearing,[37] and requested the trial court to enter findings of fact and conclusions of law regarding those issues.[38]

Furthermore, we allowed both parties to submit briefs concerning the matters addressed and trial court's findings concerning the evidentiary hearing.[39]

¶ 133 The hearing was held just two weeks after our March 17, 2004 order remanding for evidentiary hearing was entered and a full month before the time allotted for the hearing expired.[40] Defense counsel presented only four witnesses, and addressed only three of the nine questions raised, i.e., questions 2, 3, and 9. Defense counsel consistently claimed an inability to present evidence on these questions due to short amount of preparation time and unavailability of witnesses during the time the District Court set the matter down for hearing.[41] Thus, no additional evidence beyond that submitted with

content provisions of Rule 3.5, and the 100 page brief limitation of Rule 9.3. Concerning matters of ineffective assistance of trial counsel, an Appellant must set forth his or her assignments of error, supported by citations to the authorities, statutes, and parts of the record, within the appellate brief. An application for evidentiary hearing is meant to be an extract of the pertinent factual matters arising outside of the record, while appellate briefs are to contain the application of law to fact and the arguments pertaining to the issue at hand, ineffective assistance (especially those relating to matters in the record). The failure to raise in an appellate brief an issue within the record waives the issue. Rule 3.5(A)(5) and C(6). In the future, failure to fully raise and support by authority in the brief in chief those issues contained within the record will constitute waiver of those issues on appeal.

**37.** (1) Whether Appellant's trial attorneys were ineffective for failing to utilize Dr. David Sweet or some other expert at the Daubert hearing concerning the bite-mark evidence; (2) Whether Appellant's trial attorneys were ineffective in their preparation and investigation of the allegations of Christy Steenveld; (3) Whether Appellant's trial attorneys were ineffective for failing to provide a proper foundation witness concerning a check Appellant presented to his bank during the relevant time period; (4) Whether Appellant's trial attorneys were ineffective for failing to present a detailed history of his life, including his history of child abuse and neglect; (5) Whether Appellant's trial attorneys were ineffective for failing to discover and utilize extensive mental health records relating to Appellant's commitment from 1972 to 1974; (6) Whether Appellant's trial attorneys were ineffective for failing to present expert testimony to explain the connection between his history of child abuse and his crimes; (7) Whether Appellant's trial attorneys were ineffective for failing to present his wife

and son as mitigating witnesses; (8) Whether Appellant's trial attorneys were ineffective in their development and presentation of important mitigating evidence in the second stage of his trial; and (9) After considering all of the issues raised above and the matters addressed at the evidentiary hearing, whether Appellant's trial attorneys rendered constitutionally effective assistance of counsel during his trial.

**38.** The Trial Court's findings and conclusions were filed with this Court on May 13, 2004.

**39.** Briefs from both parties were submitted on May 14, 2004. We hereby grant Appellant's motion to exceed the ten-page limitation we previously set for supplemental briefs, and Appellant's brief is accepted by the Court for filing.

**40.** We allowed forty-four (44) days in which to complete the hearing, from March 17 to April 30. Appellant filed two emergency applications to stay the proceedings and extend the time within which to hold the evidentiary hearing, claiming counsel did not have adequate time to prepare for such a complex evidentiary hearing and could not procure critical witnesses within the scheduled time frame. We left the decision with the District Court concerning the time necessary to conduct the remanded evidentiary hearing, but urged the hearing to be held prior to the oral arguments, if possible. The District Court indicated the existence of an exceedingly crowded docket, with nine pending murder cases, but held the hearing on March 31, with additional days scheduled for April 1st and 2nd.

**41.** *But see* Rule 3.11(B)(3)(b)(iii), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2003) ("Upon remand, the trial court shall conduct an evidentiary hearing within thirty [30] days from the date of remand.")

Appellant's application for evidentiary hearing was entered with respect to the all-important questions raised concerning the failure to use an expert concerning the State's bitemark evidence or failure to investigate and present an adequate case in mitigation.[42]

¶ 134 The first matter arising outside the record concerns trial counsels' failure to call an expert witness to testify at the *Daubert* hearing regarding the probable "partial bitemark".[43] We have already addressed alleged problems with this evidence, offered by the State. Here, however, we are concerned with counsels' alleged ineffectiveness in declining to call its retained expert, Dr. David Sweet at the *Daubert* hearing "in order to convince the trial court to preclude Dr.Chrz's bitemark testimony."

¶ 135 Because Dr. Sweet did not appear at the remanded evidentiary hearing and appellate counsel offered no testimony or evidence at that hearing in regard to this matter, the trial judge concluded Appellant had failed, as a matter of law, to establish his trial attorneys were ineffective with respect to this issue. We agree with this conclusion, but base it upon the entire record, not just what happened, or didn't happen, at the evidentiary hearing.

¶ 136 Dr. Sweet is a Canadian citizen with faculty responsibilities at the University of British Columbia, in the area of Dentistry. He had a transplant surgery just before Appellant's trial in late 2001.[44] Due to his medical condition, the defense had a difficult time scheduling Dr. Sweet's attendance at trial. Numerous references are made in the record to problems in this regard.

¶ 137 According to the five-page affidavit attached as Exhibit A to the appendix to Appellant's application for evidentiary hear-

ing, Dr. Sweet strongly believes the methods used by the State's expert, Dr. Chrz, in rendering an opinion that the injury to Appellant's right forearm was a "probable bitemark" were flawed, that Dr. Chrz's methods lacked reliability in the scientific community, had not been subjected to peer review, and did not comport with *Daubert.* Of course, a review of Dr. Chrz's testimony at the *Daubert* hearing, makes it clear he took the opposite opinion regarding these same matters. Thus, we have a classic battle of the experts.

¶ 138 It would certainly have been helpful to the defense had they been able to have their expert appear at the *Daubert* hearing. Then the Court would have been even more aware of the dispute regarding the methods employed by Dr. Chrz, beyond those already referenced in *Crider.* The possibility of excluding testimony about a probable partial bitemark was important, given the strength of the evidence in this case.

¶ 139 However, Dr. Sweet's presence in Canada, his health, the obvious costs associated with obtaining his attendance on two separate occasions, the uncertainty of exactly when the prosecutors would present witnesses at trial (including Dr. Chrz), and the way Dr. Chrz's testimony developed during the course of the *Daubert* hearing, along with motions and evidentiary exhibits filed by the defense in an attempt to exclude Dr. Chrz's testimony, lead us to conclude Appellant's trial counsel were not ineffective for failing to have Dr. Sweet or some other expert available at the *Daubert* hearing. Defense counsel made effective arguments concerning *Daubert* and *Crider* at the *Daubert* hearing, pointed to a report from Dr. Souviron of the Dade County Florida State Medical Examin-

---

**42.** Pursuant to our rules, attachments to the application for evidentiary hearing are not considered evidence in the case until determined admissible during the course of the evidentiary hearing in the district court. Therefore, any references to exhibits/affidavits from that application in the instant case—for purpose of explanation of the allegations or a proffer of what a witness would have testified if that witness would have been called—does not mean this item has been properly admitted as evidence in the case, unless specifically noted.

**43.** See question one of the remanded evidentiary hearing, note 33.

**44.** More recently, Dr. Sweet has been undergoing a medical procedure relating to his transplant surgery that, along with his faculty responsibilities, prevented him from attending the evidentiary hearing, although he indicated he was available to testify on April 26, 2004.

er's Office,[45] and then presented Dr. Sweet at trial during their case in chief to counter the testimony presented by Dr. Chrz. We find counsel was not constitutionally ineffective for failing to take the additional step of securing Dr. Sweet's attendance at the *Daubert* hearing, even though this additional effort may have benefited their position. However, we find nothing in the record to indicate his testimony would have been any different at the *Daubert* hearing than it was at trial. There is always something additional that could have been done, in retrospect. (However, as for appellate counsel's efforts in this regard at the evidentiary hearing, see below.)

¶ 140 Next, we turn to the claim that Appellant's trial counsel failed to investigate the proposed testimony of State's witness Christy Steenveld.[46] According to an affidavit Ms. Steenveld gave in support of Appellant's application for evidentiary hearing, Ms. Steenveld retracted her trial testimony that she witnessed an offensive odor on Appellant's person on June 21, 1989. In the affidavit, she takes the position that her original statement was probably true, i.e., the event occurred on June 19, 1989, the day before Justin Wiles turned up missing. This is significant, because Steenveld's testimony corroborated Richard Collins's testimony as to date of the smell, which corroborated the State's theory that Appellant had been in the process of disarticulating his victim.

¶ 141 Ms. Steenveld testified at the remanded evidentiary hearing and retracted her retraction, again taking the position that her encounter with Appellant likely occurred on June 20 or 21, rather than June 19, 1989. Ms. Steenveld's continued flip-flopping on this important issue leads us to conclude, as did the trial court, that trial counsel was not ineffective with respect to their efforts to secure favorable testimony from Ms. Steenveld.

¶ 142 Next, we address the issue of whether trial counsel failed to investigate and discover a proper witness to verify Appellant's cancelled checks.[47] The gist here is

Appellant's claims that his trial counsel was ineffective for not presenting a better witness at trial concerning a check Appellant cashed his bank at or near the critical time period. Appellant claims his witness was effectively discredited or impeached by the State, due to her unfamiliarity with banking procedures.

¶ 143 At trial, two state witnesses testified consistently with the State's theory—insofar as the timing of the crime—by discussing when they were with Appellant on the day in question. However, according to the defense, a check presented to Appellant's bank at approximately 2:40 p.m. on June 20, 1989, conflicted with the timing to which the State's witnesses testified.

¶ 144 At trial Appellant's counsel presented Pauline Banks, a loan officer at the bank, to testify concerning checking procedures. Ms. Banks had been a loan secretary at the time and was thus unfamiliar with procedures regarding the time-stamping of checks. The State raised the possibility that the check was stamped the next day, suggesting it was actually cashed on June 19, 1989.

¶ 145 Appellant thus claimed, in his application for evidentiary hearing, that his trial counsel were ineffective for not providing a better witness, like Irene Laskey, who was the Chief Operating Officer of the bank in 1989. Ms. Laskey's affidavit indicates the check would have been time stamped with the actual date and time it was received.

¶ 146 At the remanded evidentiary hearing, Ms. Laskey testified that the bank had been closed at 2 p.m. on the day in question. The drive-through remained open, however, until 6 p.m. The customary policy for checks presented after closing hours was that they were stamped at the time they were physically presented. Thus, according to Ms. Laskey, Appellant presented the check at approximate 2:30 to 2:40 p.m. on June 20, 1989.

¶ 147 During cross-examination, it was established that Ms. Laskey did not personally receive the check; one of the bank tellers

---

45.   O.R. 976–981.

46.   See question two of the remanded evidentiary hearing, note 33.

47.   See question three of the remanded evidentiary hearing, note 33.

did. Thus, she was only testifying about customary procedures, not specifically happened with regards to this check. She acknowledged employees don't always follow customary procedure. She also indicated Pauline Banks was very competent in the area of banking procedures.

¶ 148 In its findings of fact and conclusions of law, the trial court found Ms. Laskey and Ms. Banks did not have any personal knowledge concerning how or when Appellant's check was processed. The trial court also found both witnesses had the same weaknesses to cross-examination and that there was not a reasonable probability that the outcome of the trial would have been different if Ms. Laskey would have been called. Furthermore, the trial court found, after listening to the testimony of Appellant's trial counsel, Art Fleak, that Ms. Banks was, at the time of trial, in a managerial position at the bank who was aware of banking procedures. Thus, the trial court found counsel had not been ineffective, but had exercised sound trial strategy.

¶ 149 We agree, for the most part, with these findings. *See* Rule 3.11(B)(3)(b)(iv), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18 (2003) ("The findings of fact and conclusions of law of the trial court shall be given strong deference by this Court in determining the proposition raised by appellate counsel; however, this Court shall determine the ultimate issue whether trial counsel was ineffective.") We believe Ms. Laskey would have been a better witness for the defense, more emphatic about the timing of the check's presentment. Nevertheless, neither witness was personally involved in the check's cashing, and Ms. Banks's status as a bank manager at the time of trial rendered her a worthwhile witness in her own right. This slight tactical miscalculation, if error at all, cannot be said to rise to the level of constitutionally ineffective assistance.

¶ 150 The final and most troubling claim of ineffective assistance concerns the allegation that Appellant's trial counsel failed to provide a significant case in mitigation during the second stage of Appellant's trial.[48] Trial counsel's case in mitigation came down to one witness, Dr. Dean Montgomery, a counseling psychologist. Dr. Montgomery testified briefly on Appellant's behalf, approximately nineteen transcript pages in all (with about the same amount of effective cross-examination). He had spent four hours or less with Appellant and *had not reviewed* Appellant's medical, psychiatric, or school records. Dr. Montgomery spoke to Appellant's wife and son, but had not talked to the police, members of the district attorney's office, the Medical Examiner, nor had he seen any of the police reports.

¶ 151 Understand, we are not condemning Dr. Montgomery's work or preparation. It appears he did what he was asked to do in the brief amount of time he was asked to do it. Dr. Montgomery provided a quick overview of Appellant's complicated, troubled background. He briefly addressed several important matters: Appellant's illegitimacy; how he was raised in an environment of substance abuse (alcohol and drugs, including marijuana and inhalants);[49] how his half-brother, to whom he was closest, died of a drug overdose; how he was introverted and socially isolated without many friends; how he was sexually abused by his brother Paul who reportedly "hog-tied" and "sodomized" him;[50] how he spent two years in a children's home;[51] how he spent two years in Griffin Memorial Hospital;[52] his paranoia; and his significant medical problems, including depression, degenerative joint disease, strokes, and headaches. But Dr. Montgom-

---

**48.** See questions four through eight of the remanded evidentiary hearing, note 33.

**49.** Dr. Montgomery could not recall the name of Appellant's grandmother, who was his primary caretaker.

**50.** Dr. Montgomery indicated he and Appellant "didn't go into a great detail" on the sexual abuse Appellant suffered. He could not remem-

ber the age difference between the two boys and believed it was a couple of years, instead of ten years.

**51.** Dr. Montgomery could not recall which children's home this was.

**52.** Dr. Montgomery had not reviewed the records from that hospital.

ery did not go over any of these matters in any detail. He simply mentioned them casually in a sentence or two, without amplification.

¶ 152 Dr. Montgomery also spoke briefly about how Appellant had risen above his circumstances, to a certain degree, by marrying (although "there are divorce proceedings pending"), raising a son who loves him, graduating from school, pursuing vocational training, and then having his own business.

¶ 153 Nevertheless, due to the extremely short amount of time Dr. Montgomery had with Appellant and his lack of access to key records and people familiar with Appellant, Dr. Montgomery was vulnerable to attack by the State on cross-examination. The State was thus able to point out that most of the mitigation case was based upon a short interview, i.e., Appellant's own self-reporting.

¶ 154 In other words, the State argued Appellant's case in mitigation was only as good as his own word and that Appellant had an undeniable motive to lie. The State made repeated references about how little time Appellant had spent with Dr. Montgomery and how Montgomery had failed to interview key persons.

¶ 155 Overall, Dr. Montgomery's testimony did little to educate the jury about Petitioner's adolescent life or give jurors any mitigating reason to render a verdict less than death. Appellant's attorneys did not call Appellant's son or any sympathetic member of his extended family to testify on his behalf. None of Appellant's treating psychologists or mental health professionals were called to explain his tortured past. His psychiatric records, prison records, and hospital records were not introduced or admitted at trial. There was no corroboration of any of the claims Appellant self-reported to Dr. Montgomery, so the jury may have doubted whether any of these things really happened.

¶ 156 In that sense, counsel's second stage preparation and actual presentation are eerily similar, and arguably more egregious, than those found ineffective and requiring relief in

*Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) and *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

¶ 157 Without going too deeply into what may have been admissible or presented by way of mitigation on Appellant's behalf, the record reflects the following facts are at least fairly supported by affidavits and various hospital records attached to the application for evidentiary hearing[53]: Appellant was born illegitimately and never knew his father; his uneducated mother Julie abandoned him at the age of six weeks after trying to abort him; Appellant was raised by his grandmother Minnie, who lived on social security and verbally abused Appellant, calling him names like "sorry bastard"; Minnie was also raising a paranoid schizophrenic son, Hank, who was an alcoholic and abuser of Appellant, and a severely brain damaged son, Ed; his mother Julie, her new husband, and Appellant's three older siblings moved back in with Appellant and Minnie briefly around 1962; Julie had a drinking problem and began abusing Appellant by pulling his hair, kicking him, and slapping him; later, Julie began smothering Appellant by placing her hand over his mouth and sealing his nose with her thumb until he passed out; when Appellant was 3 or 4, his brother Paul began sexually abusing him; the sexual abuse occurred numerous times and included anal rapes, yanking Appellant's testicles, binding him hands and feet, abandoning him, smothering him, twisting Appellant's penis with pliers, hanging him from a tree, and beating him to the point that he required hospitalization.

¶ 158 Additional alleged mitigating factors include: Julie again abandoned the family around 1965, and all her children (except Paul) were placed in custody of the State, in an orphanage; Appellant and his brother Johnnie were thus separated from their grandmother and from their sister Julie, and Johnnie was beaten; this stay lasted three to nine months; Appellant was soon living again

**53.** We fully recognize many of these documents are hearsay and the witnesses may have a different story when placed under oath and subjected to cross-examination. Unfortunately, appellate counsel called no witnesses to the stand when given the opportunity to at the remanded evidentiary hearing, thereby tying our hands concerning this issue.

with his grandmother and her problematic sons, who were having repeated run-ins with the law; Appellant began having problems in school; at the age of thirteen, Appellant choked his four-year old step-cousin to death with a hair ribbon, then stuffed her under the house; this led to Appellant's commitment to Griffin Memorial Hospital where he stayed for approximately nineteen months; during this time, Appellant's brother Johnnie was found burned to death and possibly died by drug overdose; some family members suspected Appellant's brother Paul was involved; not long afterward, when Appellant was release from Griffin on a pass, he smothered a 3½ year old neighbor boy, Craig Neal, and then severed the boy's penis, post-mortem; Craig was the friend of Appellant's new half brother Hal, who was Julie's three-year old offspring; Appellant pled guilty to second-degree manslaughter and was sentenced to the maximum four years.

¶ 159 Obviously, we were quite concerned about the significant gap between what was presented on Appellant's behalf in the second stage of trial and what we have addressed above. According, we outlined specific questions concerning this topic in our order remanding for evidentiary hearing.

¶ 160 Unfortunately, Appellant's appellate counsel presented *no* evidence regarding his trial counsel's case in mitigation at the remanded evidentiary hearing. One of Appellant's key witnesses for the hearing, Dr. Jon Barnes, is suffering from stage.four cancer and was so ill he could not appear to testify. (Indeed, appellate counsel now seeks to replace Dr. Barnes, due to the uncertain status of his health.) Barnes had provided an extensive affidavit for purposes of the application for evidentiary hearing, indicating he had spent more than thirteen hours with Appellant, had reviewed Dr. Montgomery's prior testimony, had review Appellant's jail, medical, and psychological records, the medical examiner's autopsy report, and nearly every available record concerning Appellant, most of which are also part of the exhibits to the application for evidentiary hearing.

¶ 161 Other key witnesses lived out of the State and were not subpoenaed in time for their attendance. The record is unclear whether any of these witnesses were in fact available, even on such short notice, but it appears they were never contacted. Furthermore, the trial court found appellate counsel made no effort to secure the attendance of nineteen witnesses (many of whom lived in close proximity) and could not give a rational reason for failing to have them present at the evidentiary hearing.

¶ 162 Appellant's counsel indicated they did not have time to secure the attendance of these witnesses. But the record indicates a great amount of time was spent trying, unsuccessfully, to obtain a continuance, instead of obtaining the attendance of fifteen witnesses who lived in the State. Appellate counsel pointed out that he is not a trial attorney, but an appellate lawyer who did the best under the circumstances. But our rules require the evidentiary hearing to be held within thirty days of remand. Therefore, by requesting such relief in its appellate filings, appellate counsel should have been prepared to conduct such a hearing in a short time frame, and this includes obtaining a seasoned trial attorney to handle the hearing, where necessary.

¶ 163 At the remanded evidentiary hearing, the trial judge ruled against Appellant with respect to questions four through eight, based entirely on appellate counsel's failure to present evidence concerning these issues. Essentially, the trial judge found appellate counsel had waived the issue by failing to present evidence regarding it. The State's supplemental brief takes this same position, claiming appellate counsel's actions at the evidentiary hearing do not evince a good faith diligent effort to obtain the witnesses.

¶ 164 In a brief filed after the evidentiary hearing, appellate counsel claims Appellant was denied a full and fair hearing on the remanded issues, in violation of the Compulsory Process Clause of the Sixth Amendment, the Due Process Clause of the Fourteenth Amendment, and Article II, Section 20 of Oklahoma's Constitution. However, it appears fairly clear from the record that appellate counsel made a strategic decision to forego further efforts to present testimony on the issue of mitigation once their main witness, Dr. Barnes, could not attend.

Appellate counsel essentially admitted this much during oral arguments before this Court, taking the position that the testimony of these other witnesses was supplemental to Dr. Barnes's testimony and would not have made sense without it. Furthermore, appellate counsel had both of Appellant's trial attorneys on the stand during the evidentiary hearing, but refused to ask any questions concerning the mitigation case the trial attorneys had presented on Appellant's behalf. This is completely unacceptable.

¶ 165 The record indicates Appellant's counsel on appeal resisted the trial judge's efforts at the evidentiary hearing to grant additional time to secure the attendance of some of the witnesses on the first two days of April. During oral arguments on this issue, appellate counsel said appellate counsel were unaware these additional days were going to be offered until the evidentiary hearing. But still, they did not take the trial judge up on his offer. Appellant's counsel on appeal took the position it was Dr. Barnes or nothing, and they were unwilling to put on whatever evidence they could and then seek further relief concerning Dr. Barnes.[54]

■ ¶ 166 Under these unique and utterly bizarre circumstances, we find the district court did not abuse its discretion in failing to grant Appellant a continuance to conduct the evidentiary hearing. We further find Appellant was not denied due process with respect to the hearing he was granted, nor did the failure to grant a continuance violate his right to compulsory process. Furthermore, we reluctantly find the actions of Appellant's counsel on appeal have effectively waived what was otherwise Appellant's strongest claim on appeal, i.e., the failure of his trial attorneys to present an adequate case in mitigation at trial.

■ ¶ 167 By granting the evidentiary hearing on Appellant's claims relating to mitigation, we had already, to a certain degree, announced a lack of confidence in the second stage proceedings, for our rules do not allow for the granting of an evidentiary hearing lightly or on a whim. The fact of the matter is that Appellant is a thrice-convicted child-killer. While his trial attorneys were wise to attack the State's weak evidence in hopes of securing an acquittal, the record strongly suggests they made some grave tactical mistakes with respect to the case in mitigation. Had they anticipated the very real possibility Appellant would be convicted of murdering Justin Wiles, then they would have seen their next best hope was to focus on the reasons why anyone would commit such inconceivable atrocities. And this would have necessarily required a close examination of Appellant's horrendous past.

¶ 168 We find Appellant was likely[55] denied the effective assistance of trial counsel with respect to the presentation of his second-stage case in mitigation, as per the Supreme Court's pronouncements in *Williams* and *Wiggins*. However, because that issue was essentially waived by appellate counsel at the evidentiary hearing and, to a certain extent, by appellate counsel's failure to properly address the issues in the appellate brief (rather than the Rule 3.11 application), we find Appellant was denied the effective assistance of appellate counsel in presenting this issue to the Court.[56] *See Evitts v. Lucey*, 469 U.S. 387, 397, 105 S.Ct. 830, 837, 83 L.Ed.2d 821 (1985) (recognizing that a criminal defendant's right to counsel on appeal,

---

54. The evidentiary hearing record reflects a certain tension between the trial judge and Appellant's counsel on appeal, likely due to an overcrowded docket and appellate counsel's formidable task at hand. Whatever the precise cause, the parties involved were unable to work through their differences of opinion on scheduling, and we are left to mop up the results.

55. We say "likely" because appellate counsel failed to ask trial counsel any questions regarding preparation, investigation, strategy, etc., of the case for mitigation at trial when afforded the opportunity to do so at the remanded evidentiary

hearing, If there was a valid trial strategy in this decision, we cannot discern it from the record.

56. To the extent appellate counsel's actions and waiver can be considered deliberate, we are required to refer them to the Oklahoma Bar Association for any action deemed appropriate. See Code of Judicial Conduct, Title 5, Ch. 1, App. 4, Canon 3(D) (2004). A copy of this opinion, together with an audio tape of the oral arguments will be transmitted to the General Counsel of the Oklahoma Bar Association and a complete copy of the briefs and pleadings will be made available, at their request.

like the right to counsel at trial, would be a futile gesture unless it comprehended the right to effective assistance of counsel).

¶ 169 Accordingly, due to the serious questions raised under *Williams* and *Wiggins* and the waiver of the these issues by appellate counsel, we are required to reverse Appellant's sentence and remand for a re-sentencing trial, for a reasonable probability exists that, in the absence of these errors, the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Strickland v. Washington,* 466 U.S. 668, 695, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984).

### C.

¶ 170 In proposition thirteen, Appellant claims the accumulation of errors deprived him of fair trial. We have found harmless error in the inability for defense counsel to effectively cross-examine an expert concerning the wire evidence (proposition four), in the admission of a post-autopsy photo of the victim's torso (proposition five), in the State's omission in preventing a police officer from commenting on Appellant's exercise of the right to counsel (proposition six), and in the prosecution team crossing over the line regarding first stage victim impact and pleas for sympathy (proposition seven). Other errors were cured by the trial judge's excellent habit of admonishing the jury.

¶ 171 We also found ineffective assistance of appellate counsel in presenting and preserving claims relating to second-stage mitigating evidence.

¶ 172 We find the accumulation of errors were harmless as to the guilt stage proceedings, and therefore affirm Appellant's conviction for first-degree murder. *Simpson,* 1994 OK CR 40, ¶ 36, 876 P.2d at 702. However, we also find some of this evidence likely impacted the sentencing decision.

¶ 173 Appellant's DEATH SENTENCE is hereby REVERSED, and the matter is remanded to the District Court of Tulsa County for a new sentencing trial in accordance with this Opinion.

JOHNSON, P.J., LILE, V.P.J., and STRUBHAR, J.: concur.

CHAPEL, J.: Dissent.

### CHAPEL, J., DISSENTING.

¶ 1 I find the evidence presented, which was entirely circumstantial, to be insufficient to convict Garrison of first degree murder beyond a reasonable doubt irrespective of whether the "reasonable hypothesis" standard or the "Spuehler" standard is used. Therefore, I would reverse the conviction.